2022-2207

---

### United States Court of Appeals
### For the Federal Circuit

---

INTELLECTUAL TECH LLC,
*Appellant*

*v.*

ZEBRA TECHNOLOGIES CORPORATION,
*Appellee*

---

**Appeal from the United States District Court for the Western District of Texas
Case No. 6:19-cv-00628-ADA**

---

### CORRECTED APPELLANT'S OPENING BRIEF

---

Timothy J.H. Craddock                    COUNSEL FOR APPELLANT
GARY R. SORDEN                          INTELLECTUAL TECH LLC
COLE SCHOTZ, P.C.
901 Main Street, Suite 4120
Dallas, Texas 75202

# CERTIFICATE OF INTEREST

Counsel for Appellant Intellectual Tech LLC certifies the following:

1.   The full name of every party or amicus represented by me is:

Intellectual Tech LLC

2.   The names of the real parties in interest represented by me are:

Intellectual Tech LLC

3.   All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Intellectual Tech LLC's parent company is OnAsset Intelligence, Inc.

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

COLE SCHOTZ, P.C.: Aaron Davidson, Brian L. King, James R. Perkins, Vishal Patel, Niky R. Bagley, Gary R. Sorden, Timothy J.H. Craddock.

5.   Other than the originating case number(s), the title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

No other case is pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal.

6.   All information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases.

The instant appeal is neither a criminal case nor a bankruptcy case.

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................................ i

TABLE OF CONTENTS ................................................................................. ii

TABLE OF AUTHORITIES ........................................................................... iv

TABLE OF ABBREVIATIONS ...................................................................... vii

STATEMENT OF RELATED CASES .......................................................... viii

STATEMENT OF JURISDICTION ................................................................ 1

STATEMENT OF THE ISSUES ..................................................................... 1

STATEMENT OF THE CASE ......................................................................... 1

    I.  Procedural History .................................................................................. 1

    II.  Factual Background ................................................................................ 2

    III. The Western District of Texas' Orders on Appeal ................................ 4

SUMMARY OF ARGUMENT ....................................................................... 6

STANDARD OF REVIEW ............................................................................. 8

ARGUMENT ................................................................................................. 8

    I.     Intellectual Tech, as Owner of the '247 Patent, has Article III
         Standing. ......................................................................................... 10

    II.    Main Street's Option to Act as Attorney-in-Fact for Intellectual
         Tech Cannot Deprive Intellectual Tech of Article III Standing. ......... 11

         1.    Because Main Street did not foreclose, Zebra could only
              obtain a license (or other relief) from Intellectual Tech. ........... 13

         2.    Even if Main Street Could License Zebra on its Own,
              Intellectual Tech has Standing to Sue for Infringement. ........... 21

3.   *Uniloc* was Incorrectly Decided; Intellectual Tech has Standing................................................................................22

CONCLUSION ........................................................................................25

CERTIFICATE OF SERVICE ...............................................................27

CERTIFICATE OF COMPLIANCE ......................................................28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abraxis Bioscience, Inc. v. Navinta LLC,*
   625 F.3d 1359 (Fed. Cir. 2010) ....................................................9, 16, 17

*Aspex Eyewear, Inc. v. Miracle Optics, Inc.,*
   434 F.3d 1336 (Fed. Cir. 2006) .............................................................6, 21

*Azure Networks, LLC v. CSR PLC,*
   771 F.3d 1336 (Fed. Cir. 2014) .................................................................24

*Chou v. Univ. of Chi.,*
   254 F.3d 1347 (Fed. Cir. 2001) .................................................................10

*Drone Techs., Inc. v. Parrot S.A.,*
   838 F.3d 1283 (Fed. Cir. 2016) ...................................................................8

*FilmTec Corp. v. Allied–Signal, Inc.,*
   939 F.2d 1568 (Fed.Cir.1991) ...................................................................16

*Holloway v. Skinner,*
   898 S.W.2d 793 (Tex. 1995).............................................................7, 15, 18

*Intellectual Property Development, Inc. v. TCI Cablevision of Cal., Inc.,*
   248 F.3d 1333 (Fed. Cir. 2001) ....................................................9, 10, 11

*Intercontinental Grp. P'ship v. KB Home Lone Star L.P.,*
   295 S.W.3d 650 (Tex. 2009) ......................................................................19

*J.M. Davidson, Inc. v. Webster,*
   128 S.W.3d 223 (Tex. 2003) ......................................................................16

*Lenape Res. Corp. v. Tenn. Gas Pipeline Co.,*
   925 S.W.2d 565 (Tex.1996)........................................................................19

*Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.,*
   925 F.3d 1225 (Fed. Cir. 2019) .............................................................8, 9

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................ 10

*Microsoft Corp. v. GeoTag, Inc.,*
    817 F.3d 1305 (Fed. Cir. 2016) ........................................... 8

*Morrow v. Microsoft Corp.,*
    499 F.3d 1332 (Fed.Cir.2007) ............................................. 8

*Pyramid Transp., Inc. v. Greatwide Dallas Mavis, LLC,*
    No. 3:12-CV-0149-D, 2013 WL 3834626 (N.D. Tex. July 25, 2013)................... 15

*Schwendimann v. Arkwright Advanced Coating, Inc.,*
    959 F.3d 1065 (Fed. Cir. 2020) ................................6, 9, 10

*Sevenson Env't Servs., Inc. v. Shaw Env't, Inc.,*
    477 F.3d 1361 (Fed. Cir. 2007) ........................................... 8

*Tawes v. Barnes,*
    340 S.W.3d 419 (Tex. 2011)................................................ 19

*Uniloc 2017 LLC v. Google LLC,*
    508 F. Supp. 3d 556 (N.D. Cal. 2020) ................................ 20

*Uniloc USA, Inc. v. Motorola Mobility LLC,*
    No. 2021-1555, 52 F.4th 1340, 2022 WL 16704090 (Fed. Cir. Nov. 4, 2022) ............................................7, 23, 24

*Uniloc USA, Inc. v. Motorola Mobility, LLC,*
    No. CV 17-1658-CFC, 2020 WL 7771219 (D. Del. Dec. 30, 2020)............... 6, 20

*WiAV Sols. LLC v. Motorola, Inc.,*
    631 F.3d 1257 (Fed. Cir. 2010) ........................................... 8

*Willis v. Gov't Accountability Off.,*
    448 F.3d 1341 (Fed. Cir. 2006) ......................................... 10

### STATUTES

35 U.S.C. §154(a)(1)............................................................ 11

35 U.S.C. § 281 ........................................................... 9, 10

### OTHER AUTHORITIES

3 Tex. Jur.3d § 26 ................................................................................. 7, 14

*Uniloc 2017 LLC v. Google LLC*, No. 2021-1498,

    Oral Argument (Fed. Cir. September 6, 2022) ..................................... 21

## TABLE OF ABBREVIATIONS

*Parties*

Appellant               Intellectual Tech LLC

Appellee                Zebra Technology Corporation


*Asserted Patents*

`247 Patent             U.S. Patent No. 7,233,247


*Defined Terms*

APPX___                 Joint Appendix page(s)

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant states as follows:

(a)   No other appeal in or from the above-captioned proceeding has previously been before this or another appellate court.

## STATEMENT OF JURISDICTION

The District Court for the Western District of Texas entered its Order dismissing Appellant's case for lack of standing on May 20, 2022. APPX000001, Order Granting in Part and Denying in Part Appellee's Motion for Summary Judgment, Dkt No. 144. On August 3, 2022, the District Court denied Appellant's Motion for Reconsideration of this order. APPX000016, Order Denying Motion for Reconsideration, Dkt No. 153. Appellants timely filed their Notice of Appeal. APPX000610, Dkt No. 154. This Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

I.  Does Intellectual Tech, as the patentee and sole owner of the patent-in-suit, have standing under Article III of the Constitution to sue, and maintain suit, for infringement of the '247 Patent.

II.  Does Main Street's option to act as attorney-in-fact for Intellectual Tech to license or assign the '247 Patent "in the name and on behalf of" Intellectual Tech deprive Intellectual Tech of constitutional standing?

## STATEMENT OF THE CASE

### I.  Procedural History

On October 22, 2019, Appellant filed a complaint in the Western District of Texas alleging that Appellee infringed certain claims of U.S. Patent No. 7,233,247 (the "'247 Patent," APPX000026). APPX000066, Complaint, Dkt No. 1. On

January 6, 2021, Appellee filed a Motion to Dismiss for Lack of Standing. APPX000222, Defendant's Motion to Dismiss, Dkt No. 62. On February 2, 2021, the District Court denied Appellee's Motion to Dismiss, APPX000299, Order Denying Defendant's Motion to Dismiss, Dkt No. 75.

On February 9, 2022, Appellee filed a Motion for Summary Judgment for Lack of Standing, APPX000302, Appellee's Motion for Summary Judgment, Dkt No. 116. On May 20, 2022, the District Court granted Appellee's Motion in part, dismissing Appellant's case for lack of standing. APPX000001, Order Granting in Part and Denying in Part Appellee's Motion for Summary Judgment, Dkt No. 144. On June 15, 2022, Appellant file a Motion for Reconsideration. APPX000580, Appellant's Motion for Reconsideration, Dkt No. 147. On August 3, 2022, the District Court denied Appellant's Motion for Reconsideration. APPX000016, Order Denying Motion for Reconsideration, Dkt No. 153.

## II.    Factual Background

Intellectual Tech is the wholly owned subsidiary of OnAsset Intelligence, Inc. OnAsset entered into a Loan Agreement with Main Street Capital Corporation in 2011. APPX000391. Under the Loan Agreement, OnAsset granted Main Street a security interest in the '247 patent. APPX000226. Upon a default on the Loan Agreement, Main Street had three options: 1) foreclose on the secured assets and take possession of the '247 Patent via execution of a "present grant" assignment; 2) act

under Sections 3(j) and 6 of 2011 Patent and Trademark Security Agreement "in the name and on behalf of" OnAsset (and later Intellectual Tech) as attorney-in-fact related to the '247 Patent; or 3) do nothing.

Main Street issued a Notice of Default on April 19, 2013. Dkt. APPX000509. The parties agree that OnAsset was in default. The parties agree also that Main Street did not foreclose or act as attorney-in-fact for OnAsset following default.

Main Street and OnAsset then entered into a Forbearance Agreement in 2017. APPX000161. Along with the Forbearance Agreement, OnAsset formed Intellectual Tech, which was subject to the Loan Agreement and its security interests. APPX000202; APPX000210. OnAsset assigned the '247 Patent to Intellectual Tech as part of the Contribution Agreement. APPX000183. Intellectual Tech's assignment from OnAsset is registered with the USPTO, and Intellectual Tech is identified as the assignee of the '247 Patent. APPX000282.

OnAsset and Intellectual Tech entered into a series of other agreements, including a Grant-Back License Agreement, that are discussed in the briefing but were not relied on by the district court in issuing its order. *See, e.g.*, Dkt. 61-5, 61-6.

On October 19, 2019, Intellectual Tech sued Zebra in the Western District of Texas. APPX000066.

Intellectual Tech, OnAsset, and Main Street then entered into a First Amendment to Forbearance Agreement effective June 2021. Under the First

3

Amendment to Forbearance Agreement, Main Street "agree[d] to forbear during the Forbearance Period from exercising and enforcing their respective rights, powers, and remedies afforded under the Loan Documents or at law, in equity, or by statute ..." APPX000556. (incorporating and further limiting Forbearance Agreement APPX000161), including the definition of Limited Forbearance and Further Consideration in Section 4). The First Amendment to Forbearance Agreement has since been supplanted by a Second Amendment to the Forbearance, which is not part of the record here, and Intellectual Tech is not in default of the operative Forbearance Agreement.

## III.    The Western District of Texas' Orders on Appeal

Zebra first moved for dismissal for lack of standing in January 2021 based on the same facts and arguments here. APPX000125. After the issues was fully briefed, the district court denied Zebra's motion and held that Intellectual Tech "is the rightful owner of the '247 patent, retains the right to enforce that patent, and thus has constitutional and statutory standing to bring a patent infringement suit against Zebra Technologies Corporation." APPX000299.

About a year later, without a change in facts or the law, Zebra filed a renewed motion to dismiss the case for lack of standing. APPX000301. This time, the district court reversed its prior decision and granted Zebra's motion, dismissing the case without prejudice. APPX000001. The district court reasoned that

> Main Street's [default] rights deprived IT of an exclusionary right at the time IT filed this Action. Zebra relies on *WiAV*, and the *Uniloc* opinions' extension of *WiAV*, to argue that IT has no exclusionary right because Zebra could obtain a license on the asserted patent from Main Street. The Court agrees. On October 22, 2019, Main Street possessed an unfettered right to license the '247 patent.

APPX000013-14. In footnote four, the district court recognized that the relevant agreements did not grant Main Street the right to license the '247 patent. Even so, the district court held that "Zebra could have obtained title to the '247 patent from Main Street, effectively licensing all of Zebra's past and ongoing accused conduct, thereby depriving IT of constitutional standing just as if Main Street had an unconditional right to license." *Id.*

Intellectual Tech moved for reconsideration, arguing that absent foreclosure by Main Street, Intellectual Tech could not lose exclusionary rights because Main Street could only act to license or assign the '247 patent "in the name and on behalf of" Intellectual Tech. APPX000580. The district court agreed that "it is more accurate to say that, on default, Main Street has an unfettered right to license and/or assign the '247 patent *in IT's name*," but refused to reverse its order and reinstate the case. APPX000022 (emphasis in original).

Intellectual Tech timely appealed.

5

## SUMMARY OF ARGUMENT

The district court was correct when it rejected Zebra's argument that default transferred ownership of the '247 Patent from Intellectual Tech, absent foreclosure by Main Street. As the patentee and sole owner of the '247 Patent, Intellectual Tech has Article III standing to sue for infringement. When a plaintiff alleges that it "is the owner by assignment of the [asserted] patent and [that the defendant] infringed that patent," "the court has both the statutory and constitutional authority to adjudicate the matter." *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1071 (Fed. Cir. 2020).

The district court erred in holding that Main Street's option to act as attorney-in-fact for Intellectual Tech and to optionally license or assign the '247 Patent "in the name and on behalf of" Intellectual Tech deprives Intellectual Tech of Article III standing.

First, Intellectual Tech did not license or assign any rights to Main Street. But even if it did, Intellectual Tech, as the patent owner, has standing even when a licensee has a "virtually unfettered right to sublicense" the patent. *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1342 (Fed. Cir. 2006). The district court thus erred in adopting the reasoning in *Uniloc USA, Inc. v. Motorola Mobility, LLC*, No. CV 17-1658-CFC, 2020 WL 7771219, at *3 (D. Del. Dec. 30, 2020) that "extended *WiAV* to hold that even a patent owner lacks constitutional standing if a third party has an

6

unfettered right to sublicense the asserted patent." *See Uniloc USA, Inc. v. Motorola Mobility LLC*, No. 2021-1555, 52 F.4th 1340, 2022 WL 16704090, at *8-9 (Fed. Cir. Nov. 4, 2022) (J. Lourie, concurring).

Second, Texas law is clear that Main Street's option to act as attorney-in-fact authorizes Main Street to perform certain acts "in the name and on behalf of" Intellectual Tech but confers no substantive rights on Main Street. 3 Tex. Jur.3d § 26 (citing *Eastham v. Hunter*, 102 Tex. 145, 114 S.W. 97 (1908); *Pyramid Transp., Inc. v. Greatwide Dallas Mavis, LLC*, No. 3:12-CV-0149-D, 2013 WL 3834626, at *2–3 (N.D. Tex. July 25, 2013). So even if Main Street had exercised its right to act as attorney-in-fact for Intellectual Tech, which it never did, it could only act "in the name and on behalf of" Intellectual Tech. Thus, any license would be in Intellectual Tech's name from Intellectual Tech, not Main Street. *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995) ("As a general rule, the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts."). So contrary to the district court's order, *only Intellectual Tech has the right to license the the'247 Patent, absent foreclosure by Main Street*. Because Main Street did not foreclose, Intellectual Tech cannot have lost constitutional standing to sue Zebra for patent infringement.

## STANDARD OF REVIEW

Review of a dismissal for lack of subject matter jurisdiction is reviewed *de novo*. *Microsoft Corp. v. GeoTag, Inc.*, 817 F.3d 1305, 1311 (Fed. Cir. 2016). Review of a district court's contract interpretation is also *de novo*. *Sevenson Env't Servs., Inc. v. Shaw Env't, Inc.*, 477 F.3d 1361, 1364–65 (Fed. Cir. 2007). Texas contract law applies to the contract between Intellectual Tech LLC (Appellant) and Main Street Capital Corporation. So Texas law should be applied in interpreting this contract. *See id.*

## ARGUMENT

Article III standing is needed to satisfy the "case-or-controversy" limitation on federal jurisdiction. *See Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1234 (Fed. Cir. 2019). To establish constitutional standing, a plaintiff must show that it has suffered an injury in fact. *Drone Techs., Inc. v. Parrot S.A.*, 838 F.3d 1283, 1292 (Fed. Cir. 2016) The "touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury." *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010). A patent owner that holds exclusionary rights and interests in a patent has constitutional standing to sue infringers. *See Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339 (Fed.Cir.2007); *Univ. of S. Fla. Rsch. Found., Inc. v. Fujifilm Med. Sys.*

*U.S.A., Inc.*, 19 F.4th 1315, 1324 (Fed. Cir. 2021) ("[C]onstitutional standing is satisfied when a party holds at least one exclusionary right."). Exclusionary rights "involve the ability to exclude others from practicing an invention or to forgive activities that would normally be prohibited under the patent statutes." *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1234 (Fed. Cir. 2019) (internal quotations omitted). To lose constitutional standing, a patentee must make a present grant of exclusionary rights to a third party. *See Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364–65 (Fed. Cir. 2010).

"As long as a plaintiff alleges facts that support an arguable case or controversy under the Patent Act, the court has both the statutory and constitutional authority to adjudicate the matter." *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1071 (Fed. Cir. 2020). Article III standing is satisfied when, as here, a plaintiff alleges that it "is the owner by assignment of the [asserted] patent and [that the defendant] infringed that patent." *Id*; *see also Intellectual Property Development, Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001) ("title in the patent" "confers constitutional standing on the [patentee] to sue another for patent infringement in its own name."); 35 U.S.C. § 281 ("A patentee shall have remedy by civil action for infringement of his patent.").

## I.  Intellectual Tech, as Owner of the '247 Patent, has Article III Standing.

Intellectual Tech has title in the patent, has not given anyone an exclusive license to the patent, accuses Zebra of infringing its patent, and seeks no less than a reasonable royalty for Zebra's unauthorized infringement of its patent. APPX000066. Intellectual Tech thus has constitutional standing to sue for infringement. *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1071 (Fed. Cir. 2020) ("As long as a plaintiff alleges facts that support an arguable case or controversy under the Patent Act, the court has both the statutory and constitutional authority to adjudicate the matter."); *Intellectual Property Development, Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001) ("title in the patent" "confers constitutional standing on the [patentee] to sue another for patent infringement in its own name."); *Chou v. Univ. of Chi.*, 254 F.3d 1347, 1359 (Fed. Cir. 2001) (economic harm is a sufficient "injury-in-fact"); *see also* 35 U.S.C. § 281.

This outcome makes perfect sense in the context of both patent law and general Article III considerations. For one, a party has Article III standing where it suffers a "concrete" and "particularized" injury to a "legally protected interest." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). That interest may exist "by virtue of statutes creating legal rights, the invasion of which creates standing." *Willis v. Gov't Accountability Off.*, 448 F.3d 1341, 1344 (Fed. Cir. 2006). The Patent Act "grant[s] to

the patentee the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States." 35 U.S.C. §154(a)(1); *see* §§100(d), 261; *Intellectual Property*, 248 F.3d at 1345 ("Standing in a patent infringement case is derived from the Patent Act"). That exclusionary right is violated when someone "makes, uses, offers to sell, or sells [the] patented invention" in this country "without authority." §271(a). Zebra did just that by practicing the inventions of the '247 Patent without authority.

For this reason alone, Intellectual Tech has Article III standing to sue Zebra for infringing its patent.

## II. Main Street's Option to Act as Attorney-in-Fact for Intellectual Tech Cannot Deprive Intellectual Tech of Article III Standing.

Upon default, Main Street had three options. The first option was to foreclose on the secured assets and take possession of the collateral, including the '247 Patent via execution of a "present grant" assignment. *See, e.g.*, APPX000007-8. Main Street has not done that. Main Street's second option was to act under Sections 3(j) and 6 of 2011 Patent and Trademark Security Agreement "in the name and on behalf of" Intellectual Tech as attorney-in-fact related to the '247 Patent. APPX000231-232.[1]

---

[1] Intellectual Tech cites the 2011 Patent and Trademark Security Agreement just as the district court did in the Order because the 2017 Patent and Trademark Security Agreement (APPX000246) "mirrored the terms in the 2011 Patent and Trademark Security Agreement." In any event, whether the district court's analysis in footnote

Main Street has not done that. Main Street's third option was to do nothing and continue to allow the individuals making decisions for Intellectual Tech to carry on doing so. The record reflects and the parties agree that Main Street has chosen option three.

These options and who had exclusionary rights under each option are shown in the graphic and explained below.



None of the three options automatically assigned any exclusionary rights to Main Street via a "present grant" assignment. In fact, there was never a "present grant"

two of its opinion is correct, the arguments are the same and apply equally to either the 2011 or the 2017 Patent and Trademark Security Agreements.

to Main Street for any exclusionary right including the right to license or assign the '247 Patent. Intellectual Tech did not lose Article III standing to sue Zebra for infringement.

**1.    Because Main Street did not foreclose, Zebra could only obtain a license (or other relief) from Intellectual Tech.**

Because Main Street never foreclosed on the secured assets and take possession of the collateral, including the '247 Patent, the only "right" Main Street could exercise was the option to act "in the name and on behalf of" Intellectual Tech as its agent-in-fact to control what Intellectual Tech did with the '247 Patent.

Under this second option, Main Street could act under Secs. 3(j) and 6 of the 2011 Patent and Trademark Security Agreement as "attorney-in-fact of [Intellectual Tech]" to exercise its rights. APPX000231-232.[2]

> **Power of Attorney**. To facilitate Secured Party's taking action under subsection (i) and exercising its rights under Section 6, Debtor hereby irrevocably appoints (which appointment is coupled with an interest) Secured Party, or its delegate, as the attorney-in-fact of Debtor with the right (but not the duty) from time to time while a Default exists to create, prepare, complete, execute, deliver, endorse or file, **in the name and on behalf of Debtor**, any and all instruments, documents, applications, financing statements, and other agreements and writings required to be obtained, executed, delivered or endorsed by Debtor under this Section 3, or, necessary for Secured Party, while a Default exists, to enforce or use the

---

[2] Main Street could also "exercise any or all remedies available under the Loan Agreement," but Zebra has not alleged any of these remedies are relevant to standing. And the district court did not rely on any of them in issuing its order. Nor are they relevant as none are "present grant" assignment of any title or rights in the '247 Patent.

Patents or Trademarks or to grant or issue any exclusive or non-exclusive license under the Patents or Trademarks to any third party, or to sell, assign, transfer, pledge, encumber or otherwise transfer title in or dispose of the Patents or Trademarks to any third party. Debtor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof. The power of attorney granted herein shall terminate upon the termination of the Loan Agreement as provided therein and the payment and performance of all Obligations.

*Id.* (emphasis added).

> Remedies. While a Default exists, Secured Party may, at its option, take any or all of the following actions:
>
> (a) Secured Party may exercise any or all remedies available under the Loan Agreement.
>
> (b) Secured Party may sell, assign, transfer, pledge, encumber or otherwise dispose of the Patents and Trademarks.
>
> (c) Secured Party may enforce the Patents and Trademarks and any licenses thereunder, and if Secured Party shall commence any suit for such enforcement, Debtor shall, at the request of Secured Party, do any and all lawful acts and execute any and all proper documents required by Secured Party in aid of such enforcement.

*Id*. These sections specify the actions Main Street could take (Sec. 6) and provide the mechanism for Main Street to take those actions (Sec. 3(j)). But absent foreclosure, each of these actions could be done only "in the name and on behalf of" Intellectual Tech. Holding otherwise misinterprets the Security Agreement and ignores the corporate distinction between Main Street and Intellectual Tech.

First, under Texas law (APPX000006, n.1), a "power of attorney is a written instrument by which one person, the principal, appoints another as agent and

14

authorizes the agent to perform certain specified acts on behalf of the principal." 3 Tex. Jur.3d § 26 (citing *Eastham v. Hunter,* 102 Tex. 145, 114 S.W. 97 (1908); *Comerica Bank–Texas v. Tex. Com. Bank Nat'l Ass'n,* 2 S.W.3d 723 (Tex.App.1999, pet. denied)). "That is, [the power of attorney] does not itself provide the agent with a substantive right as an assignment does." *Pyramid Transp., Inc. v. Greatwide Dallas Mavis, LLC,* No. 3:12-CV-0149-D, 2013 WL 3834626, at *2–3 (N.D. Tex. July 25, 2013). So "the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts." *Holloway v. Skinner,* 898 S.W.2d 793, 795 (Tex. 1995).

So even if it exercised that "right," Main Street could only cause Intellectual Tech to take certain actions, like to "sell, assign, transfer, pledge, encumber or otherwise dispose of" the '247 Patent, among others, "in the name and on behalf of" Intellectual Tech. Main Street could not take those actions as Main Street. So even if Main Street could cause Intellectual Tech to assign the patent to Main Street, there would have to be a written assignment using present grant language, and that did not occur here.

Second, to read Section 6 as giving Main Street the ability to exercise those exclusionary rights on their own without a "present grant" assignment of rights or title, as the district court does in the Order, renders Section 3(j) meaningless. That is improper under Texas law. As the Texas Supreme Court has held, in construing an

agreement, Courts "must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). But if Main Street could exercise those rights on their own without an assignment of rights or title, rather than "in the name and on behalf of" Intellectual Tech, there would be no need for Section 3(j). And "[i]n construing a written contract" under Texas law "ascertain[ing] the true intentions of the parties" is the court's "primary concern." *Id.* Interpreting Section 3(j) such that it is meaningless defeats "the true intentions of the parties as expressed in the instrument." *Id.*

But not only does the court's reading thwart the parties' intent and render Section 3(j) meaningless, it also interprets Section 6 contrary to law. Take Main Street's option to "assign" the '247 Patent under Section 6 that the district court focused on. APPX000231-232. Main Street cannot assign the '247 Patent *as Main Street* because it does not have title to the '247 Patent.[3] *See, e.g.*, *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1365 (Fed. Cir. 2010) ("At that time AZ-UK could not assign the patents because it did not possess their titles."); *FilmTec Corp. v. Allied–Signal, Inc.*, 939 F.2d 1568, 1572 (Fed.Cir.1991) (stating that the purported

---

[3] 35 U.S.C. **§** 261 requires assignments of patents to be in writing.

assignment is a nullity if the assignor had nothing to assign). Instead, the patent can

only be assigned by Intellectual Tech or "in the name and on behalf of" Intellectual

Tech, which would mean the exclusionary rights remained with Intellectual Tech.

This is a clear example of the district court committing reversible error. As the

district court says in its order:

> It could be argued that Main Street did not possess a right to license the
> '247 Patent because Section 6 of the 2011 Patent and Trademark
> Security Agreement does not explicitly provide for a right to license, even
> though Section 3(j) grants a power of attorney to license in support of
> Section 6. Section 6 did, however, expressly provide a right to assign: the
> '247 Patent; and the right to sue for "past infringement" of the '247
> Patent. *See* ECF No. 62-2 at Section 6 (granting rights to "Patents"),
> Section 1 ("Patents" defined to include "right to sue for past
> infringement and damages). **Accordingly, Zebra could have obtained**
> **title to the '247 Patent from Main Street, effectively licensing all of**
> **Zebra's past and ongoing accused conduct, thereby depriving IT of**
> **constitutional standing just as if Main Street had an unconditional**
> **right to license.**

APPX000013, n.4 (emphasis added). But as the district court correctly found a few

pages before in the Order, Main Street did not have title to the '247 Patent and thus

had nothing to assign. APPX000007-08. ("Main Street had the right to take title to

(that is, foreclose upon) the '247 Patent so long as OnAsset was in default, but there

is no indication Main Street exercised that option."). The district court never

explained how Zebra "could have obtained title to the '247 Patent from Main Street,"

when Main Street did not have title to the '247 Patent. That is because Zebra could

not obtain title from Main Street. *Abraxis*, 625 F.3d at 1365. Only Intellectual Tech can assign the patent, which it never did. As a result, Zebra could only obtain title from Intellectual Tech. The district court thus erred in concluding that "Zebra could have obtained title to the '247 Patent from Main Street, effectively licensing all of Zebra's past and ongoing accused conduct, thereby depriving IT of constitutional standing just as if Main Street had an unconditional right to license." APPX000013, n. 4.

In its order denying reconsideration, the district court came around and admitted that Main Street could only "license and/or assign the '247 patent *in IT's name*" but still refused to reverse its order dismissing the case. APPX000022 (emphasis in original). But the fact that Main Street can only act "in the name and on behalf of" Intellectual Tech, absent foreclosure, shows that Intellectual Tech has not given up any exclusionary rights. *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995) ("As a general rule, the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts."). The district court thus erred in finding Intellectual Tech lost constitutional standing.

Another example from the same provision proves the district court's analysis was incorrect under Texas law and how the Order undermines the parties' express

intent.[4] In the same "Power of Attorney" section, Main Street has the right to act as attorney-in-fact "in the name and on behalf of" Intellectual Tech to "enforce" the '247 Patent. But under the district court's analysis, the same provision that would permit Main Street to step into Intellectual Tech's shoes to enforce the '247 Patent against Zebra in this lawsuit deprives Intellectual Tech of standing to enforce the '247 Patent against Zebra in this lawsuit. Such a reading that frustrates the express intent of the parties violates basic tenets of contract interpretation under Texas law and cannot be correct.

Finally, even assuming the *Uniloc* district court decisions were correct, this "attorney-in-fact" option is not what Fortress was granted in the *Uniloc* cases. *See, e.g.,* APPX000011-13. As the district court noted, "the Unilocs granted Fortress a license, with a right to sublicense, on the Unilocs' patent portfolio in exchange for a $26

_____

[4] Under Texas law, a "contract's overriding purpose is to capture the parties' intent, meaning [the Court] must construe it in light of how the parties meant to construe it." *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.,* 295 S.W.3d 650, 657–58 (Tex. 2009); "[A] court should construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served." *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.,* 925 S.W.2d 565, 574 (Tex.1996). "When discerning the contracting parties' intent, courts must examine the entire agreement and give effect to each provision so that none is rendered meaningless. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Tawes v. Barnes,* 340 S.W.3d 419, 425 (Tex. 2011) (internal citations and quotations omitted).

million loan with which the Unilocs meant to fund campaigns to monetize their portfolio." *Id.* (emphasis added). "The license agreement specified that Fortress could not to 'use' the license and right to sublicense unless and until the Unilocs defaulted on the loan." *Id.* This was a "present grant" license, executed in writing, before the default and before Uniloc filed suit. Then, upon default, Fortress had the right to sublicense the patents at its "sole and absolute discretion solely for the benefit of [Fortress]." *Uniloc*, 2020 WL 7771219, at *1. By contrast, Main Street, in the event of default, could take possession by foreclosure[5] or act "in the name and on behalf of" Intellectual Tech control what Intellectual Tech did with the '247 Patent. That is different from the license grant in the *Uniloc* cases, which "effected an immediate transfer of rights" and was thus the "present grant" of rights required to give exclusionary rights to Fortress. *Uniloc 2017 LLC v. Google LLC*, 508 F. Supp. 3d 556, 569 (N.D. Cal. 2020) ("Indeed, the RSA expressly refers to the license as a 'present grant.'"). There is no such "present grant" or "immediate transfer of rights" in the

---

[5] Nothing suggests Fortress had the right to foreclose and take possession of the Unilocs' patents, further supporting Intellectual Tech's argument that those cases are different than this case. The only option discussed in the cases for Fortress to exert formal control was to sublicense. *See, e.g.*, *Uniloc USA, Inc. v. Motorola Mobility, LLC*, No. CV 17-1658-CFC, 2020 WL 7771219, at *7 (D. Del. Dec. 30, 2020) ("At that point—on May 16, 2017—Fortress had the legal right to grant Motorola a sublicense to the '134 patent and thus, under *WiAV*, the Unilocs no longer possessed the right to exclude Motorola from practicing the patent.").

2011 Patent and Trademark Security Agreement or any of the other agreements. Only foreclosure, and its attendant assignment of title of the '247 Patent from Intellectual Tech to Main Street, would transfer any exclusionary rights to Main Street, but Main Street never foreclosed.

In sum, because Main Street did not foreclose and take possession of the '247 Patent via a written, "present grant" assignment, Zebra could only obtain a license (or other relief) from Intellectual Tech. Thus Intellectual Tech did not lose any exclusionary rights and cannot have lost Article III standing.

### 2. Even if Main Street Could License Zebra on its Own, Intellectual Tech has Standing to Sue for Infringement.

This Court has never held that a patent owner loses the right to enforce its own patents just because a third-party could grant a license to the defendant. *See, e.g.*, *Uniloc 2017 LLC v. Google LLC*, No. 2021-1498, Oral Argument at 27:13 (Fed. Cir. September 6, 2022) (available at

https://oralarguments.cafc.uscourts.gov/default.aspx?fl=21-1498_09062022.mp3)

(noting that Google's argument assumed that a patent owner loses their exclusive

rights when they give someone else the ability to potentially sublicense the patents, but questioning '***where have we ever said that?***') (emphasis added).

In fact, this Court has held just the opposite. Patent owners have standing even where a third party has a "virtually unfettered right to sublicense" the patent in suit. *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336 (Fed. Cir. 2006).

So even the mere possibility that Main Street could have granted Zebra a license cannot defeat Intellectual Tech's constitutional standing. This result makes perfect sense here because Zebra's ability to obtain a license from Main Street, if it exists at all, is illusory. Zebra has taken considerable discovery from Main Street over several years, but there is no evidence that it could *actually* get a license or other relief from Main Street. In fact, rather than grant Zebra a license, Main Street has entered into a series of forbearance agreements and the like in an express effort to ensure Intellectual Tech has and retains standing to sue Zebra for patent infringement.

**3.    *Uniloc* was Incorrectly Decided; Intellectual Tech has Standing.**

The district court's opinion here rests solely on the correctness of the *Unlioc* district court cases. The district court's order "follows the *Uniloc* opinions, and their extension of *WiAV*, to find a lack of constitutional standing." APPX000014. As noted above, the Court expressed serious doubts about the district courts' standing analysis in the *Uniloc* decisions. But for other reasons, the Court did not reach the merits of that argument in its decision.

Uniloc argues that the Delaware District Court erred in dismissing these two actions for lack of standing. Uniloc maintains that even if it granted a license and right to sublicense to Fortress, the district courts' rulings are not consistent with our decisions in *Aspex Eyewear, Inc. v Miracle Optics, Inc.*, 434 F.3d 1336 (Fed. Cir. 2006) and *Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.*, 604 F.3d 1354 (Fed. Cir. 2010). There we held that the patentee's grant of a license that includes the right to sublicense did not deprive the patent owner of Article III standing. *Aspex Eyewear*, 434 F.3d at 1339–44; *Alfred E. Mann Found. for Sci. Rsch.*, 604 F.3d at 1358–63. Uniloc distinguishes cases relied on by the district court as involving the standing of licensees (rather than patentees) who lacked an exclusive license.

**We recognize there is considerable force to Uniloc's argument that, even if Fortress had been granted a license and an unfettered right to sublicense, Uniloc would have Article III standing. Patent owners and licensees do not have identical patent rights, and patent owners arguably do not lack standing simply because they granted a license that gave another party the right to sublicense the patent to an alleged infringer.** But, we need not resolve the question of whether a patent owner who granted a right to sublicense lacks standing here. We hold that, in light of *Apple* 2020 WL 7122617, Uniloc is collaterally estopped from asserting that it has standing in these cases.

*Uniloc USA, Inc. v. Motorola Mobility LLC*, No. 2021-1555, 2022 WL 16704090, at *3 (Fed. Cir. Nov. 4, 2022) (emphasis added).

As the Court has held, a patentee does not lose constitutional standing to sue for infringement just because a third party *may* license the patents as well.[6] *Id.* at *8-9. As controlling case law makes clear, district courts, including the district court here,

---

[6] Intellectual Tech disagrees that Main Street can license the patent in its own name.

are misinterpreting this Court's prior decisions and improperly extending those cases,

like *WiAV*, to situations in which they do not apply. As Judge Laurie wrote:

> [*WiAV* is] not on point either, as our case here is not concerned with exclusive licenses, but with non-exclusive licenses. The question is whether by granting those licenses the patent owner was precluded from suing parties not licensed. The cited cases do not support that conclusion.
>
> **The grant of a non-exclusive license with the right to sublicense, as here, gives the licensee the right to sublicense others. But the patentee still retains the right to sue unlicensed infringers.** A non-exclusive license only grants a licensee freedom from suit; it does not divest the licensor of its right to sue or license other parties, or to practice the patent itself. *See* 14B Chisum on Patents 6240 (2022) ("A license may amount to no more than a covenant by the patentee not to sue the licensee for making, using or selling the patented invention, the patentee reserving the right to grant others the same right.") (internal quotation marks and citation omitted).
>
> **It is true that the licensee could preempt such a suit by granting a sublicense, immunizing the purported infringer. But that is a far cry from holding that the patent owner, simply by having granted a non-exclusive license with the right to sublicense, loses the power to sue an unlicensed infringer.**
>
> Thus, while agreeing in full that Uniloc loses its appeal by being estopped from suing Motorola because it settled its suit with Apple rather than appealing it, it is not because it lost the power to sue by granting Fortress a nonexclusive license with the right to sublicense.

*Id.* at *9 (emphasis added). The district court here held the opposite.

> Main Street's rights deprived IT of an exclusionary right at the time IT filed this Action. Zebra relies on *WiAV*, and the *Uniloc* opinions' extension of *WiAV*, to argue that IT has no exclusionary right because

Zebra could obtain a license on the asserted patent from Main Street. The Court agrees.

APPX000013. *Azure*, which the district court also cited, is also a case about exclusive licenses, and thus does not apply here. *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1343 (Fed. Cir. 2014), *cert. granted, judgment vacated*, 575 U.S. 959 (2015) ("The parties do not dispute that the Agreement transferred to Azure an exclusive license to practice the '129 patent.").

For at least the reasons explained by Judge Laurie, Intellectual Tech did not lose Article III standing even if the Court finds that Main Street could license the '247 Patent on its own.

## CONCLUSION

As the patent owner, Intellectual Tech has constitutional standing to sue and maintain suit against Zebra. Main Street's option to act as attorney-in-fact "in the name and on behalf of" Intellectual Tech does not deprive Intellectual Tech of standing. This Court should thus reverse the district court's order and remand this case for further proceedings.

Dated: January 26, 2022       Respectfully submitted,

*/s/ Timothy J.H. Craddock*
Timothy J.H. Craddock
Gary R. Sorden

COLE SCHOTZ, P.C.
901 Main Street, Suite 4120
Dallas, Texas 75202
Telephone: (469) 557-9390
Facsimile: (469) 533-1587
tcraddock@coleschotz.com
gsorden@coleschotz.com

**COUNSEL FOR APPELLANT**
**INTELLECTUAL TECH LLC**

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on January 26, 2023, by electronic means using the CM/ECF System, which will serve via email notice of such filing to any of the following counsel registered as CM/ECF users:

William R. Peterson
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
william.peterson@morganlewis.com

Brent A. Hawkins
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105
brent.hawkins@morganlewis.com

James John Kritsas
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, IL 60606
james.kritsas@morganlewis.com

Amanda Scott Williamson
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive, Suite 500
Chicago, IL 60606
amanda.williamson@morganlewis.com

*Attorneys for Appellee Zebra Technologies Corporation*

Upon acceptance by the Court of the e-filed document, six (6) paper copies will be filed with the Court within the time provided in the Court's rules.

January 26, 2023                    */s/ Timothy J.H. Craddock*
                                   Timothy J.H. Craddock

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e) in that it contains 6,100 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) in that it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Goudy Old Style type.

January 26, 2023                    */s/ Timothy J.H. Craddock*
                                   Timothy J.H. Craddock

ADDENDUM

# TABLE OF CONTENTS

**ORDERS APPEALED FROM**

Order Granting in Part and Denying in Part Appellee's Motion for Summary Judgment ....................................................................................... APPX000001

Order Denying Motion for Reconsideration ........................................... APPX000016

**PATENT-IN-SUIT**

U.S. Patent No. 7,233,247 ....................................................................... APPX000026

# TAB 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| **INTELLECTUAL TECH LLC,**<br>            **Plaintiff,**<br><br>*v.*<br><br>**ZEBRA TECHNOLOGIES<br>CORPORATION,**<br>            **Defendant.** | **6:19-cv-00628-ADA** |

## MEMORANDUM OPINION & ORDER GRANTING-IN-PART-AS-MODIFIED AND DENYING-IN-PART DEFENDANT ZEBRA'S MOTION FOR SUMMARY JUDGMENT FOR LACK OF STANDING [ECF No. 116]

Came on for consideration this date is Defendant Zebra Technologies Corporation's Motion for Summary Judgment for Lack of Standing Pursuant to Federal Rules of Civil Procedure 56. ECF No. 116 (the "Motion"). Plaintiff Intellectual Tech LLC ("IT") filed an opposition on March 3, 2022, ECF No. 123, to which Zebra replied on March 17, 2022, ECF No. 124. The Court heard oral arguments on the Motion on May 2, 2022. *See* ECF No. 141. That same day, the Court ordered this Action stayed pending resolution of the Motion. ECF No. 142. After careful consideration of the Motion, the Parties' briefs, and the applicable law, the Court **GRANTS-IN-PART-AS-MODIFIED AND DENIES-AS-MOOT-IN-PART** Zebra's Motion for Summary Judgment for Lack of Standing Pursuant to Federal Rules of Civil Procedure 56. ECF No. 116.

### I. BACKGROUND

Whether IT suffered a constitutional injury depends on a series of interrelated agreements that IT entered into with its parent, OnAsset Intelligence, Inc. ("OnAsset"), and OnAsset's creditor, Main Street Capital Corporation ("Main Street"). OnAsset gave Main Street a security interest in U.S. Patent No. 7,233,247 (the "'247 patent") in exchange for a loan. And when OnAsset defaulted on that loan, Main Street gained certain rights in the '247 patent by dint of its security

APPX000002

interest. OnAsset and Main Street later entered a forbearance agreement to deal with on OnAsset's default. IT sprung from that forbearance and was given, along with title to the '247 patent, a mandate to monetize the '247 patent. In furtherance of that mandate, IT sued Zebra in this Court on October 22, 2019, alleging infringement of the '247 patent. *See* ECF No. 1. But the rights Main Street maintained in the '247 patent—through security interests followed by defaults—cast a cloud over IT's constitutional.

## II. LEGAL STANDARD

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650, 198 L. Ed. 2d 64 (2017). To have standing, IT "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016). "Th[at] triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement," and IT, as "the party invoking federal jurisdiction[,] bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) (footnote omitted).

Regional circuit law governs standards for the "dismissal of a complaint for lack of standing unless the issue is unique to patent law and therefore exclusively assigned to the Federal Circuit." *Univ. of S. Fla. Rsch. Found., Inc. v. Fujifilm Med. Sys. U.S.A.*, 19 F.4th 1315, 1323 (U.S. Fed. Cir. 2021). Federal Circuit law governs an entity's constitutional standing in a patent infringement action. *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1263 (Fed. Cir. 2010).

"[E]ach element of Article III standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, with the same evidentiary requirements of

APPX000003

that stage of litigation." *Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 366 (5th Cir.), *as revised* (Feb. 1, 2018), *cert. denied*, 139 S. Ct. 211, 202 L. Ed. 2d 126 (2018) (quotation marks omitted). Thus, at summary judgment, IT cannot rely on "mere allegations"; it "must set forth by affidavit or other evidence specific facts" supporting standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) (quotation marks omitted).

### III. ANALYSIS

#### A.      Summary Judgment, Reconsideration, and Subject Matter Jurisdiction

IT asserts that this Court should deny Zebra's Motion on procedural grounds because this Court already disposed of this issue at the dismissal stage. ECF No. 123 at 1. On January 19, 2021, Zebra filed a motion to dismiss for lack of constitutional and statutory standing. ECF No. 68. That motion became ripe on January 29, 2021, ECF No. 74 (the "Dismissal Motion"), and the Court entered a brief order holding that "Intellectual Tech LLC is the rightful owner of the '247 patent, retains the right to enforce that patent, and thus has constitutional and statutory standing to bring a patent infringement suit against Zebra Technologies Corporation," ECF No. 75. IT contends that, "under Federal Rule of Civil Procedure 12(d), Zebra's Motion to Dismiss must be treated as a motion for summary judgment under Rule 56," supposedly because Zebra's motion to dismiss "presented matters outside the pleadings, including certain loan, security, and forbearance agreements." ECF No. 123.

This Court need not treat Zebra's Dismissal Motion as a motion for summary judgment because courts in the Fifth Circuit are permitted to resolve factual disputes underlying subject matter jurisdiction without converting a motion under Rule 12(b)(1) to one for summary judgment. *See, e.g.*, *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) ("In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute."). And in any event, the Court has authority under Rule 54(b) to "to revise[] at any time

APPX000004

any order or other decision . . . [that] does not end the action." *Austin v. Kroger Texas*, *L.P.*, 864 F.3d 326, 336 (5th Cir. 2017) (quoting Fed. R. Civ. P. 54(b)) (internal quotation omitted, alterations in original). Federal Rule of Civil Procedure 54(b) "reflect[s] the inherent power of the rendering district court to afford such relief from interlocutory judgments as justice requires." *Id.* (internal quotation omitted). In accordance with this Rule, courts may reconsider and reverse prior decisions "even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Id.* Accordingly, the Court exercises its discretion to reconsider any prior judgment as to IT's rights in the '247 patent as it bears on constitutional standing.

Moreover, as to the instant Motion, the Fifth Circuit has "expressed doubt as to the propriety of summary judgment as a tool for disposing of a case on jurisdictional grounds when the district court does not actually purport to address the merits of the parties' dispute." *Gaspard v. Amerada Hess Corp.*, 13 F.3d 165, 168 (5th Cir. 1994). The Federal Circuit has likewise treated a summary judgment motion for lack of subject matter jurisdiction as a "suggestion" that the district court should dismiss under Rule 12(b)(1). *See Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 883–84 (Fed. Cir. 1985); *see also* Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 & n.33 (3d ed.) (collecting cases). The Court, therefore, treats this Motion as a renewed motion to dismiss under Rule 12(b)(1).

### B.    Constitutional Standing

#### 1.    Main Street's Rights

As explained in more depth below, the Court's constitutional-standing inquiry focuses on whether IT had an exclusionary right when it filed suit against Zebra. To ascertain the scope of IT's rights, the Court must consider what rights IT ceded to its creditor, Main Street, if any.

APPX000005

a.      Structure of the Parties' Agreements

On April 2, 2011, OnAsset, Plaintiff IT's parent company, entered into a "2011 Loan Agreement" with a lender, Main Street.[1] ECF No. 116 at 2. As a condition of the 2011 Loan Agreement, OnAsset granted a security interest in all of its property, including the '247 patent. ECF No. 116 at 2. According to the "2011 Patent and Trademark Security Agreement" between OnAsset and Main Street, if OnAsset defaulted on the 2011 Loan Agreement, Main Street could, "at its option," "sell, assign, transfer, pledge, encumber or otherwise dispose" of the '247 patent. ECF No. 62-2 at Section 6. But only so long as OnAsset was in default. *Id.* ("While a Default exists . . . .").

The 2011 Patent and Trademark Security Agreement also "irrevocably" appointed Main Street as OnAsset's "attorney-in-fact," with "the right (but not the duty)" to execute any agreement in OnAsset's name necessary for Main Street to enforce, license, sell, assign, transfer, pledge, encumber, or otherwise transfer title in the '247 patent. *Id.* at Section 3(j). Main Street could only exercise this power of attorney while OnAsset was in default and only "[t]o facilitate [Main Street's] . . . exercising" the rights Main Street accrued while OnAsset was in default of the 2011 Loan Agreement. *Id.*

On April 19, 2013, Main Street issued a notice of default to OnAsset. *See* ECF No. 116 at 3. There is no dispute that OnAsset defaulted. *See id.* On June 2, 2017, OnAsset and Main Street entered into a "2017 Forbearance Agreement," which required that OnAsset engage in "Monetization Actions" with respect to the '247 patent. *See* ECF No. 116 at 3–4. To that end, OnAsset formed its subsidiary, Plaintiff IT. *See* ECF No. 116 at 4. Also on June 2, 2017, OnAsset

---

[1] It is this Court's understanding that Texas law governs the relevant agreements referred to herein. *See also* ECF No. 123 at 8 n.5.

APPX000006

and IT entered into a Contribution Agreement that assigned the '247 patent to IT. *See* ECF No. 116 at 4; ECF No. 123 at 3.

At the same time, IT and Main Street executed: a 2017 Joint Agreement binding IT to the 2011 Loan Agreement as a borrower, *see* ECF No. 116 at 4 n.3; and a "2017 Patent and Trademark Security Agreement" that mirrored the terms in the 2011 Patent and Trademark Security Agreement, ECF No. 62-8; *see* ECF No. 116 at 4 n.3. But by December 2018, IT had defaulted on several obligations under the 2017 Forbearance Agreement and 2011 Loan Agreement. *See* ECF No. 116 at 5. Nevertheless, IT initiated this action in October 2019. ECF No. 1. Almost two years later, in the summer of 2021, IT and Main Street entered into a First Amended Forbearance Agreement. *See* ECF No. 116 at 5.

b.     Effect of Default

Zebra alleges that OnAsset's 2013 default divested OnAsset of its rights in the '247 patent, making the 2017 assignment to IT ineffective. This Court disagrees. By its terms, the 2011 Patent and Trademark Security Agreement undoubtedly granted Main Street the right, on OnAsset's default, to enforce, "sell, assign, transfer, pledge, encumber or otherwise dispose of" the '247 patent. ECF No. 62-2 at Section 6. It did not, however, automatically divest OnAsset of title to the '247 patent. Texas law provides that, after default, a secured party "may take possession of the collateral," not that the debtor is automatically divested of title to the collateral. Tex. Bus. & Com. Code § 9.609(a)(1). Moreover, many of the secured party's rights after a default will be dictated "by agreement of the parties." *Id.* § 9.601(a), and no agreement herein provided for automatic divestment.

Main Street had the right to take title to (that is, foreclose upon) the '247 patent so long as OnAsset was in default, but there is no indication Main Street exercised that option. Accordingly,

APPX000007

the 2017 assignment of the '247 patent from OnAsset to IT was proper and there is no defect in the chain of title. IT's rights in the '247 patent were, however, subject to Main Street's rights under Section 6 of the 2011 Patent and Trademark Security Agreement. *See* ECF No. 62-2 at Section 7 ("This Agreement shall be binding upon and inure to the benefit of Debtor and Secured Party and their respective participants, successors and assigns . . . ."). And Main Street's rights under that section would only revert to IT if, for example, Main Street waived them or OnAsset cured its default of the 2011 Loan Agreement.

The Court holds that the 2017 Forbearance Agreement did not act to revert Main Street's rights in the '247 patent to IT. Rather, the terms of the 2017 Forbearance Agreement unequivocally provide that Main Street was merely forbearing "any exercise and enforcement of such rights." ECF No. 68-2 at IT001670, 1672 (Section 4(a)), 1679 (Section 9), 1682–83 (Section 17). Moreover, the Court is satisfied that IT's December 2018 default on the 2017 Forbearance Agreement relieved Main Street of its duty to forbear exercising its rights to the '247 patent.[2] *See* ECF No. 68-2 at IT001627 (Section 4(a)).

As such, when IT initiated this Action on October 22, 2019, Main Street possessed rights to enforce, "sell, assign, transfer, pledge, encumber or otherwise dispose of" the '247 patent. Main Street's possession of those rights was uninterrupted from at least April 19, 2013, when it issued its notice of default to OnAsset. From June 2, 2017 (the effective date of the 2017 Forbearance Agreement) to December 2018 (when IT defaulted on the 2017 Forbearance Agreement and 2011 Loan Agreement), Main Street was bound to forbear exercising its rights in the '247 patent.

---

[2] Even if it could be argued that the 2017 Forbearance Agreement reverted Main Street's rights in the '247 patent to IT, IT's 2018 default provided an identical set of rights to Main Street according to Section 6 of the 2017 Patent and Trademark Security Agreement. ECF No. 62-8 at Section 6.

APPX000008

IT's opposition to Zebra's Motion is not inconsistent with this description of the distribution of rights among IT, Main Street, and OnAsset. IT primarily objected to Zebra's theory that title in the '247 patent automatically transferred to Main Street on default. ECF No. 123 at 6–9. This Court rejects Zebra's "automatic transfer theory"—or at least IT's articulation of that theory—for those reasons stated above (and those IT identified). ECF No. 123 at 7. As explained above, while title to the '247 patent did not pass automatically, other rights in the '247 patent did. And Zebra correctly notes how IT's opposition "misses the mark." ECF No. 124 at 1. "The issue not whether *ownership* of the '247 patent transferred upon default, but rather whether the rights that Main Street received deprive IT of its . . . ability to exclude others from using the [patented] invention." *Id.* As discussed below, the Court holds that the rights Main Street received deprived IT of those exclusionary rights critical to constitutional standing.

### 2.    Constitutional Standing Demands an Exclusionary Right

Ascertaining standing in a patent-infringement case requires an inquiry into both Article III or "constitutional" standing and what has been called "statutory" or "prudential" standing. To have constitutional standing, a plaintiff must have an "exclusionary right." *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007). To have statutory standing, a plaintiff must have "all substantial rights" to the asserted patent. *Id.*

As other courts have more coherently explained, "constitutional standing in a patent case is anything but straightforward." *Uniloc USA, Inc. v. Motorola Mobility, LLC*, No. CV 17-1658-CFC, 2020 WL 7771219, at *3 (D. Del. Dec. 30, 2020) (hereinafter, *Motorola*). The Supreme Court has confirmed that patent owners and even exclusive licensees have constitutional standing to sue for patent infringement. *See Indep. Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 459, 469, 472 (1926). As the decades have rolled by, however, it has become increasingly unclear who qualifies as a "patent owner" or an "exclusive license"—or whether these labels are helpful in

APPX000009

discerning who suffers a constitutional injury by another's infringement. *See id.* (collecting cases). In *WiAV Solutions LLC v. Motorola, Inc.*, the Federal Circuit attempted to bring desperately needed clarity. 631 F.3d at 1265. It determined that an exclusive licensee has no constitutional standing to sue a defendant who holds a license or can obtain one. That is, it has no "exclusionary right" against such a defendant. *See generally id.*

a.    The *WiAV* Opinion

The *WiAV* opinion laid out in clear terms how courts should evaluate the constitutional standing of those alleging to be exclusive licensees. The panel clarified two strains of its precedent: cases involving an agreement explicitly deeming the plaintiff an "exclusive licensee," like the case before the *WiAV* court; and cases involving agreements of lesser clarity as to the nature of the granted license. Authority in the latter category endorsed a searching inquiry to determine whether the patentee intended for the plaintiff to be its exclusive licensee. *Id.* at 1264–65; *Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 1485 (Fed. Cir. 1998) (holding that a requirements contract for the accused product did not convert the exclusive supplier into an "exclusive licensee" because the licensor did not promise that all others would be excluded from practicing the patented invention); *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1368 (Fed. Cir. 2008) (holding that a licensee was not an "exclusive licensee" because others were permitted to practice the invention in the relevant territory).

Once a court determines that the parties to the relevant agreement intended for the plaintiff to be an exclusive licensee—in *WiAV*, the relevant agreement explicitly labeled the plaintiff as such—it will be presumed that the plaintiff has constitutional standing to sue any entity *not* falling into one of the following two buckets. *WiAV*, 631 F.3d at 1267. In the first bucket are non-exclusive licensees in existence at the time plaintiff received the exclusive license. *Id.*; *see also Alfred E.*

9

*Mann Found. For Scientific Research v. Cochlear Corp.*, 604 F.3d 1354 (Fed. Cir. 2010) (concluding that a licensee was an exclusive licensee of a patent despite the licensor retaining the ability to license the patent to settle lawsuits). The second bucket holds any entity that could obtain a license. For example, a defendant could obtain a license from a member of the first bucket that possesses a right to sublicense the defendant. *WiAV*, 631 F.3d at 1267. "[I]f an exclusive licensee has the right to exclude others from practicing a patent, and a party accused of infringement does not possess, and is incapable of obtaining, a license of those rights from any other party, the exclusive licensee's exclusionary right is violated." *Id.* at 1266–67.

The *WiAV* panel concluded that its plaintiff had constitutional standing to sue the named defendants because the rights of certain third parties to sublicense the asserted patents were so cabined that the named defendants could not obtain a license on the accused technology. This Court, like others, reads *WiAV* to mean that an "exclusive licensee" lacks constitutional standing to sue *anyone* if a third party has an unconditional right to license the asserted patent to *everyone*. *See Motorola*, 2020 WL 7771219, at *4 ("[U]nder *WiAV*, a third party's legal right to grant the defendant a license to the asserted patent deprives an exclusive licensee plaintiff of standing." (citing *ChromaDex, Inc. v. Elysium Health, Inc.*, 507 F. Supp. 3d 579, 585 (D. Del. 2020))).

Two district courts—the District of Delaware and the Northern District of California— recently extended *WiAV* to hold that even a patent owner lacks constitutional standing if a third party has an unfettered right to sublicense the asserted patent. The Court considers those two opinions in turn and joins them in extending *WiAV*.

b.     The *Uniloc* Cases

In *Motorola*, the U.S. District Court for the District of Delaware held that plaintiffs, Uniloc Luxembourg, S.A. and Uniloc USA, Inc. (collectively, the "Unilocs"), lacked constitutional

10

standing to sue for patent infringement where the Unilocs defaulted on a loan from Fortress Credit Co. LLC ("Fortress"), causing Fortress to automatically accrue a right to sublicense the asserted patents. 2020 WL 7771219, at *8.Years earlier, in late 2014, the Unilocs granted Fortress a license, with a right to sublicense, on the Unilocs' patent portfolio in exchange for a $26 million loan with which the Unilocs meant to fund campaigns to monetize their portfolio. *Id.* at *1. The license agreement specified that Fortress could not to "use" the license and right to sublicense unless and until the Unilocs defaulted on the loan. *Id.* The *Motorola* court described the structure of this license as a "security" on the loan. *Id.*

In March 2017, the Unilocs failed to meet a required monetization goal under the loan agreement; though Fortress "did not view or treat" the Unilocs as having defaulted, the *Motorola* court deemed the derogation a default. *Id.* at *7. Moreover, the default "was neither cured by the Unilocs nor waived by Fortress." *Id.* Upon default, Fortress was, in the court's judgment, free to use its right to sublicense the asserted patent. *Id.* at *8. Fortress held that right as of November 2017, when the Unilocs initiated a patent infringement suit against Motorola. *Id.*

The *Motorola* court opined that the existence of Fortress's unfettered right to sublicense at the time the Unilocs sued Motorola defeated the Unilocs' constitutional standing. *Id.* In holding so, the court read *WiAV* as dictating that "a third party's legal right to license the asserted patent to the defendant deprives the patent's owner . . . of standing to sue for infringement." *Id.* at *4. From this and other precedent, the *Motorola* court distilled a guiding principle: "it is the violation of the exclusionary rights that come with a patent that constitutes the injury-in-fact necessary for Article III standing in a patent infringement case." *Id.* at *5. Reasoning that a plaintiff has no exclusionary right "if another party has the right to allow the defendant to use the patent," the court held that the Unilocs abandoned their exclusionary rights by defaulting on their loan agreement

APPX000012

with Fortress and thereby ceding to Fortress the unfettered ability to sublicense.[3] *Id.* Accordingly, the Unilocs did not have constitutional standing to sue Motorola for patent infringement. *Id.*

The U.S. District Court for the Northern District of California considered the same facts only weeks before (though with a different defendant) and reached the same result under the same rationale. *Uniloc USA, Inc. v. Apple, Inc.*, No. C 18-00358 WHA, 2020 WL 7122617, at *7–8 (N.D. Cal. Dec. 4, 2020) (hereinafter, *Apple*) ("A patent licensee's right to grant an unencumbered sublicense renders even the *patent owner's* right to exclude (and, thus, to sue) illusory.").

### 3.    IT Lacked an Exclusionary Right

The Court holds that Main Street's rights deprived IT of an exclusionary right at the time IT filed this Action. Zebra relies on *WiAV*, and the *Uniloc* opinions' extension of *WiAV*, to argue that IT has no exclusionary right because Zebra could obtain a license on the asserted patent from Main Street. The Court agrees. On October 22, 2019, Main Street possessed an unfettered right to license the '247 patent.[4] *See supra* Section III.B.1.b. Meaning Zebra had the "ability to obtain" a

---

[3] The *Motorola* court noted a divide in pre-*WiAV* Federal Circuit opinions. In one corner, the court held that a patentee had standing even where a third party had a right to sublicense. *See Alfred E. Mann*, 604 F.3d at 1362; *Aspex Eyewear, Inc. v. Miracle Options, Inc.*, 434 F.3d 1336, 1342 (Fed. Cir. 2006). Yet in another case, the court held that a third party's right to sublicense deprived a patentee of standing. *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014), *vacated on other grounds*, 575 U.S. 959 (2015). The latter opinion is consistent with the *WiAV* opinion's robust analysis of the issue. Accordingly, this Court will follow the opinion in *Azure*, as extended in *WiAV*.

[4] It could be argued that Main Street did not possess a right to license the '247 patent because Section 6 of the 2011 Patent and Trademark Security Agreement does not explicitly provide for a right to license, even though Section 3(j) grants a power of attorney to license in support of Section 6. Section 6 did, however, expressly provide a right to assign: the '247 patent; and the right to sue for "past infringement" of the '247 patent. *See* ECF No. 62-2 at Section 6 (granting rights to "Patents"), Section 1 ("Patents" defined to include "right to sue for past infringement and damages). Accordingly, Zebra could have obtained title to the '247 patent from Main Street, effectively licensing all of Zebra's past and ongoing accused conduct, thereby depriving IT of constitutional standing just as if Main Street had an unconditional right to license.

APPX000013

license to the '247 patent from Main Street. *WiAV*, 631 F.3d at 1266. At the very least, IT has not

provided contrary evidence regarding Zebra's ability to obtain a license from Main Street. *Cf.*

*Semcon IP Inc. v. Huawei Device USA Inc.*, No. 216CV00437JRGRSP, 2017 WL 1017424, at *3

(E.D. Tex. Feb. 21, 2017) (declining to dismiss a case for lack of constitutional standing where

plaintiff provided evidence that relevant third parties did not have the "ability to grant any

defendant a license"), *R&R adopted*, No. 2:16-CV-437-JRG-RSP, 2017 WL 1001286 (E.D. Tex.

Mar. 15, 2017). Because Zebra had that ability, IT could not have an exclusionary right against

Zebra sufficient to engender Article III standing here.

At oral arguments, IT attempted to distinguish *Motorola* and *Apple* by noting that neither

dealt with a security agreement. IT also argued that even if Main Street had rights under Section

6, it could only exert those rights "on behalf of Intellectual Tech, not as Main Street." The Court

cannot figure how these distinctions are material; neither speaks to a constraint on Main Street's

ability to license Zebra's conduct. Accordingly, the Court follows the *Uniloc* opinions, and their

extension of *WiAV*, to find a lack of constitutional standing.

IT "must show Article III standing both at the time of the filing of the complaint and

throughout the lawsuit." *Brackeen v. Haaland*, 994 F.3d 249, 438 (5th Cir. 2021); *Lujan*, 504 U.S.

at 569–70 & n.4 (standing "is to be assessed under the facts existing when the complaint is filed.");

*Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1077 (Fed. Cir. 2020)

(Reyna, J. dissenting) ("A plaintiff must have Article III standing at the time it filed suit."). For

the foregoing reasons, IT failed to show Article III standing at the time of the filing of its complaint.

4.     IT Cannot Retroactively Cure Defects in Constitutional Standing

IT requests that it be afforded the opportunity to cure any defects in constitutional standing

by joining Main Street or substituting it under Federal Rules of Civil Procedure 19 or 20. But it is

well established that a defect in Article III standing "cannot be cured by the addition of a party

APPX000014

with standing, nor by the subsequent purchase of an interest in the patent in suit." *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1203 (Fed. Cir. 2005); *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010); *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998). Accordingly, the Court determines that this Action cannot proceed in view of an incurable standing defect.

### C.    Prudential Standing

Given its holding as to constitutional standing, the Court need not address Zebra's prudential standing challenge.

## IV. CONCLUSION

It is therefore **ORDERED** that Zebra's Motion for Summary Judgment for Lack of Standing Pursuant to Federal Rules of Civil Procedure 56, ECF No. 116, is **GRANTED-IN-PART-AS-MODIFIED AND DENIED-AS-MOOT-IN-PART**.

**IT IS ORDERED** that Zebra's Motion, ECF No. 116, is **GRANTED** to the extent it requests dismissal under Federal Rule of Civil Procedure 12(h)(3) and/or 12(b)(1) of IT's claims for lack of subject matter jurisdiction due to IT's lack of constitutional standing. **IT IS THEREFORE ORDERED** that all of IT's claims against Zebra are hereby **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Zebra's Motion, ECF No. 116, is **DENIED-AS-MOOT** as to Zebra's challenge to IT's statutory standing.

The Clerk of the Court is directed to **CLOSE** the above-captioned matter.

SIGNED this 20th day of May, 2022.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

14

# TAB 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

INTELLECTUAL TECH LLC,
Plaintiff,

v.

ZEBRA TECHNOLOGIES
CORPORATION,
Defendant.

6:19-cv-00628-ADA

## MEMORANDUM OPINION & ORDER

Came on for consideration this date is the Joint Motion for Entry of Disputed Bill of Costs, ECF No. 148, and Plaintiff Intellectual Tech LLC's Motion for Reconsideration and Reinstatement. ECF No. 147 (the "Motion"). Defendant Zebra Technologies Corporation ("Zebra") responded to the Motion on June 29, 2022, ECF No. 150, to which Intellectual Tech LLC ("IT") replied on July 6, 2022, ECF No. 151. After careful consideration of the motions, the parties' briefs, and the applicable law, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the Joint Motion for Entry of Disputed Bills of Costs, ECF No. 148, and **DENIES** Plaintiff's Motion for Reconsideration and Reinstatement, ECF No. 147.

### I. BACKGROUND

Whether IT suffered a constitutional injury sufficient to give it standing depends on a series of interrelated agreements IT entered into with its parent, OnAsset Intelligence, Inc. ("OnAsset"), and OnAsset's creditor, Main Street Capital Corporation ("Main Street"). OnAsset gave Main Street a security interest in U.S. Patent No. 7,233,247 (the "'247 patent") in exchange for a loan. And when OnAsset defaulted on that loan, Main Street gained certain rights in the '247 patent by dint of its security interest. OnAsset and Main Street later entered a forbearance agreement to deal with OnAsset's default. IT sprung from that forbearance and was given, along with title to the '247

1

patent, a mandate to monetize the '247 patent. In furtherance of that mandate, IT sued Zebra in this Court on October 22, 2019, alleging infringement of the '247 patent. *See* ECF No. 1. But the rights Main Street maintained in the '247 patent—through security interests followed by defaults—deprived IT of constitutional standing.

The Court concluded as much in an opinion rendered May 20, 2022. *See Intellectual Tech LLC v. Zebra Techs. Corp.*, No. 6:19-cv-00628-ADA, 2022 U.S. Dist. LEXIS 90905, at *19 (W.D. Tex. May 20, 2022) (the "*Dismissal Op.*"). The Court determined that, on October 22, 2019— when IT initiated this Action—IT was in default on a loan from Main Street. *See id.* at *10. According to the relevant contractual provisions, Main Street received certain rights the moment IT defaulted. *See id.* These included the unfettered right to enforce, "sell, assign, transfer, pledge, encumber or otherwise dispose of" the '247 patent. *See id.* The Court concluded that IT had no exclusionary right against Zebra at the time IT initiated this Action because Main Street could have licensed Zebra's allegedly infringing conduct on that day. *Id.* This, the Court opined, inevitably followed from one vein of relevant caselaw. *Id.* (first citing *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257 (Fed. Cir. 2010); then citing *Uniloc USA, Inc. v. Motorola Mobility, LLC*, No. CV 17-1658-CFC, 2020 WL 7771219, at *3 (D. Del. Dec. 30, 2020); and then citing *Uniloc USA, Inc. v. Apple, Inc.*, 2020 U.S. Dist. LEXIS 228257, 2020 WL 7122617, at *7–8 (N.D. Cal. Dec. 4, 2020)).

IT asks the Court to reconsider that ruling under Federal Rule of Civil Procedure 59(e) to correct what it sees as manifest errors. Identifying no manifest error, the Court declines to do so.

## II. LEGAL STANDARD

### A. Article III Standing

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650, 198 L. Ed. 2d 64 (2017). To have

APPX000018

standing, IT "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016). "Th[at] triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement," and IT, as "the party invoking federal jurisdiction[,] bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103-04, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) (footnote omitted).

Regional circuit law governs standards for the "dismissal of a complaint for lack of standing unless the issue is unique to patent law and therefore exclusively assigned to the Federal Circuit." *Univ. of S. Fla. Rsch. Found., Inc. v. Fujifilm Med. Sys. U.S.A.*, 19 F.4th 1315, 1323 (U.S. Fed. Cir. 2021). Federal Circuit law governs an entity's constitutional standing in a patent infringement action. *See WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1263 (Fed. Cir. 2010).

"[E]ach element of Article III standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, with the same evidentiary requirements of that stage of litigation." *Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 366 (5th Cir.), *as revised* (Feb. 1, 2018), *cert. denied*, 139 S. Ct. 211, 202 L. Ed. 2d 126 (2018) (quotation marks omitted). Thus, at summary judgment, IT cannot rely on "mere allegations"; it "must set forth by affidavit or other evidence specific facts" supporting standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) (quotation marks omitted).

Ascertaining standing in a patent-infringement case requires an inquiry into both Article III or "constitutional" standing and what has been called "statutory" or "prudential" standing. To have constitutional standing, a plaintiff must have an "exclusionary right." *Morrow v. Microsoft*

APPX000019

*Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007). To have statutory standing, a plaintiff must have "all substantial rights" to the asserted patent. *Id.*

### B.      Reconsideration

Motions for reconsideration are made under Rule 59(e) of the Federal Rules of Civil Procedure. "Under Rule 59(e), amending a judgment is appropriate (1) where there has been an intervening change in the controlling law; (2) where the movant presents newly discovered evidence that was previously unavailable; or (3) to correct a manifest error of law or fact." *Demahy v. Schwarz Pharma, Inc.*, 702 F.3d 177, 182 (5th Cir. 2012).

### C.      Costs

Federal Rule of Civil Procedure 54(d)(1) provides: "Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). Federal Circuit law governs the definition of a "prevailing party" in patent cases. *See, e.g.*, *Raniere v. Microsoft Corp.*, 887 F.3d 1298 (Fed. Cir. 2018). Section 1920 of Title 28 "control[s] a federal court's power to hold a losing party responsible for the opponent's fees" by limiting what costs can be awarded. *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 444, 107 S. Ct. 2494, 96 L. Ed. 2d 385 (1987).

### III. ANALYSIS

### A.      The Court Will Not Reconsider the *Dismissal Op.*

The *WiAV* and *Uniloc* opinions laid down the following principle: a patent title holder can deprive itself of exclusionary rights by vesting a third party with a right to assign or sublicense the patent (even if the third party never exercises those rights). The Court cannot stress this point enough: holding title to a patent is not the same as holding exclusionary rights to a patent. In the *Uniloc* opinions, the patent title holders, the Unilocs, did not have exclusionary rights because they vested a third party, Fortress, with a right to sublicense the patent. Fortress did not have an

4

exclusionary right in the asserted patent, but Fortress's right to sublicense the same sufficed to deprive the Unilocs of their exclusionary right. *See Dismissal Op.* at *15–17.

IT has not grasped these concepts. Its briefing returns, again and again, to whether Main Street received exclusionary rights in the '247 patent. To whether Main Street ever deprived IT of title to the '247 patent.[1] That is not the critical question. The Court affirms that, upon default, title to the '247 patent remained with IT. *See Dismissal Op.* at *7 ("[Default] did not, however, automatically divest OnAsset of title to the '247 patent."). The critical question is whether Main Street received rights upon IT's default that deprived IT—the undisputed title holder—of exclusionary rights. Just as Fortress's unfettered right to sublicense deprived the title holder, the Unilocs, of exclusionary rights, Main Street's unfettered right to license and/or assign the '247 patent deprived IT of exclusionary rights.[2] Main Street did not have to take title to the '247 patent to achieve this. It bears repeating: Main Street did *not have to take title to the '247 patent* to achieve this. The Motion's fixation on Main Street not taking title to the '247 patent is, therefore, misplaced.

Despite IT's holding title to the '247 patent, IT lacked exclusionary rights because, on default, Main Street had the right to assign or license the '247 patent to Zebra (or anyone else). In

---

[1] *See, e.g.*, ECF No. 147 at 1 ("The other two options do not transfer any exclusionary rights from Intellectual Tech to Main Street . . . ."); *id.* at 4 ("[N]one of those three options provides a 'present grant' of exclusionary rights to Main Street."); *id.* at 5 ("Main Street received no exclusionary rights."); *id.* at 5 ("Main Street does not have title or any exclusionary rights to the '247 patent."); *id.* at 10 ("Only foreclosure would transfer the exclusionary rights to Main Street . . .); ECF No. 151 at 1 (stating that Main Street's power of attorney "does not mean that Main Street had any exclusionary rights"); *id.* ("Because Main Street did not have title to the '247 Patent, Zebra could not obtain title from Main Street."); *id.* at 2 ("Main Street received no exclusionary rights . . . ."); *id.* ("[F]oreclosure is a prerequisite for Main Street to exercise exclusionary rights."); *id.* at 4 ("The power of attorney does not give Main Street any independent right to exclude.").

[2] The *Dismissal Op.* explains this in detail, with reference to *WiAV* and the *Uniloc* opinions. *See Dismissal Op.* at *13–17.

APPX000021

ceding these rights to Main Street, IT opened the door for Main Street to license Zebra's accused conduct such that IT could not exercise its exclusionary rights against Zebra. *Cf. WiAV*, 631 F.3d at 1266 ("[A]n exclusive licensee lacks standing to sue a party who has the ability to obtain such a license from another party with the right to grant it."). And it is Zebra's *ability* to receive a license to the patent[3] that destroys IT's exclusionary rights against Zebra.

IT may be correct that it is more accurate to say that, on default, Main Street has an unfettered right to license and/or assign the '247 patent *in IT's name*. It concedes that Zebra could obtain title to the '247 patent. ECF No. 147 at 9 ("Zebra could only obtain title from [IT], whether under control of Main Street, Main Street's delegate, or otherwise."). But in IT's reading of the relevant agreements, Main Street, acting as IT's "agent-in-fact," would have to assign or license the '247 patent to Zebra in IT's name. ECF No. 147 at 5–9. It proclaims that this distinction "is the whole ball game." *Id.* Why? IT won't tell.[4]

The Court, having already been frustrated by IT's unwillingness to address the significance of the distinction, does not appreciate IT's continued silence. *Dismissal Op.* at *18 ("The Court cannot figure how these distinctions are material."). During default, Main Street may assign or license the '247 patent to Zebra or anyone else, it may just have to do so in IT's name. That is the extent of IT's involvement; IT has no veto power or authority to otherwise constrain Main Street's discretion regarding who can receive a license or title to the '247 patent. The Court's preceding analysis is completely unaffected by this lone condition on Main Street's right to license and/or assign the '247 patent during default. Main Street plainly had "the right to allow the defendant to

---

[3] IT concedes this. ECF No. 147 at 9 ("Zebra could only obtain title from Intellectual Tech, whether under control of Main Street.").

[4] For this proposition, IT cites *Dismissal Op.* at *17 n.3 without indicating what reasoning therein supports IT's position.

APPX000022

use the patent," so IT did "not have the ability to prevent the defendant from practicing" it. *Uniloc USA, Inc. v. Motorola Mobility, LLC*, 2020 U.S. Dist. LEXIS 244512, at *15. In conclusion, Main Street did not receive title to the '247 patent on default, but it did receive rights sufficient to deprive title-holder IT of its exclusionary rights. *See Dismissal Op.* at *11–19. Not having those rights when it filed suit, IT lacked constitutional standing. *See id.*

IT has not given this Court any reason to reconsider the *Dismissal Op*.

### B. Zebra is Not a Prevailing Party

Zebra has requested that the Court tax costs pursuant to Rule 54(d)(1), Local Rule 54, and § 1920. Zebra is not, however, a "prevailing party" under Rule 54(d)(1) because the Court dismissed IT's claims on jurisdictional grounds and without prejudice. Accordingly, Zebra is not entitled to costs.

As the Supreme Court has recently described:

> Congress has included the term "prevailing party" in various fee-shifting statutes, and it has been the Court's approach to interpret the term in a consistent manner. . . . The Court has said the "touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties." . . . This change must be marked by "judicial imprimatur."

*CRST Van Expedited, Inc. v. E.E.O.C.*, 578 U.S. 419, 422 (2016) (citations omitted). It further clarified that a "defendant may prevail even if the court's final judgment rejects the plaintiff's claim for a nonmerits reason." *Id.* at 431.

In *Raniere v. Microsoft Corp.*, the Federal Circuit followed *CRST* to affirm a district court's deeming defendants the "prevailing party" for purposes of 35 U.S.C. § 285[5] after the plaintiff's claims were dismissed for lack of standing. 887 F.3d at 1307. The panel described the defendants

---

[5] The Federal Circuit treats "the prevailing party issue under Rule 54 and § 285 in a similar fashion." *Raniere*, 887 F.3d at 1307 n.3.

APPX000023

as having "won" by achieving a dismissal *with prejudice*. *Id.* at 1306. "[T]hey prevented [the plaintiff] from achieving a material alteration of the relationship between them, based on a decision marked by 'judicial imprimatur.'" *Id.* In categorizing the defendants as "prevailing," the Court also took great pains to discuss how dismissal was "with prejudice," equating that to a decision on the merits. *Id.* at 1308.

Here, dismissal was without prejudice. *See Dismissal Op.* at *19. The Court concluded that IT lacked constitutional standing but granted dismissal without prejudice. IT cannot resuscitate this Action by resolving defects in its exclusionary rights, *see id.*, but IT is entitled to cure those defects and refile this Action. Zebra contends that "[i]t remains hypothetical if [IT] can or ever will be able to cure the standing defects that required dismissal of this lawsuit and refile this suit." ECF No. 148 at 3. IT disagrees, arguing that this "litigation is essentially just postponed until . . . the standing defect is cured and the case is refiled." *Id.* at 5. The existence of Main Street and IT's 2021 Forbearance Agreement suggests that IT may, with Main Street's cooperation, be able to cure its standing defects (if it has not done so already). Accordingly, the Court affirms that dismissal was appropriately without prejudice.

Given that, and *Raniere*'s focus on the significance of dismissal *with* prejudice, the Court concludes Zebra is not a prevailing party. The dismissal order did not alter the legal relationship between the parties given that IT may simply re-file this Action once it cures standing defects. This accords with how circuit courts beyond the Federal Circuit have treated judgments without prejudice. *See Citi Trends, Inc. v. Coach, Inc.*, 780 F. App'x 74, 79 (4th Cir. 2019) (collecting cases describing how judgments with "no preclusive effect on the plaintiff's ability to re-file does not confer prevailing party status"); *Dunster Live, LLC v. LoneStar Logos Mgmt. Co., LLC*, 908 F.3d 948, 951 (5th Cir. 2018); *Mixing & Mass Transfer Techs., LLC v. SPX Corp.*, No. CV 19-

APPX000024

529 (MN), 2020 WL 6484180, at *3 (D. Del. Nov. 4, 2020) (holding that an order dismissing without prejudice "would not materially alter the legal relationship of the parties"). At bottom, Zebra is not a prevailing party and so is not entitled to costs under Rule 54(d)(1) or § 1920.

### C.     The Court Grants IT's Extension

In the Joint Motion for Entry of Disputed Bill of Costs, IT moved for a retrospective four-day extension under Federal Rule of Civil Procedure 6(b)(1)(B) for its objections to Zebra's bill of costs. Based on IT's representations, the Court is satisfied that IT promptly identified its error and that IT's delay in issuing objections was brief, accidental, and acted little prejudice upon Zebra.

## IV. CONCLUSION

It is therefore **ORDERED** that Plaintiff's Motion for Reconsideration and Reinstatement, ECF No. 147, is **DENIED**.

It is **FURTHER ORDERED** that the parties' Joint Motion for Entry of Disputed Bill of Costs, ECF No. 148, is **GRANTED-IN-PART** and **DENIED-IN-PART**. IT's motion for an extension therein is **GRANTED** and the motion for entry of the bill of costs is **DENIED**.

SIGNED this 3rd day of August, 2022.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

APPX000025

# TAB 3

Case 1:22-cv-00728-ADA Document 6 Filed 10/04/21 Page 66 of 82

(12) **United States Patent**
Crossno et al.

(10) Patent No.: **US 7,233,247 B1**
(45) Date of Patent: **Jun. 19, 2007**

(54) **METHOD AND SYSTEM FOR EMPLOYING RFID TAGS IN AUTOMATED APPLICATIONS**

(75) Inventors: **Adam Crossno**, Flower Mound, TX (US); **Viswanath Puttagunta**, Irving, TX (US); **Ravi Kumar Viswaraju**, Richardson, TX (US)

(73) Assignee: **SAVR Communication Inc.**, Irving, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 185 days.

(21) Appl. No.: **11/039,221**

(22) Filed: **Jan. 20, 2005**

(51) **Int. Cl.**
*G08B 13/14* (2006.01)
(52) **U.S. Cl.** .................................. **340/572.1**; 340/10.1
(58) **Field of Classification Search** .. 340/572.1–572.9, 340/5.2, 5.52, 10.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,537,094 A * | 7/1996 | Bettine et al. | ........... 340/572.4 |
| 5,798,693 A * | 8/1998 | Engellenner | ............. 340/10.33 |
| 2005/0055582 A1* | 3/2005 | Bazakos et al. | ............. 713/202 |
| 2006/0145865 A1* | 7/2006 | Forster | .................... 340/572.8 |
| 2006/0174130 A1* | 8/2006 | Noble | ........................ 713/182 |

* cited by examiner

*Primary Examiner*—Phung T. Nguyen
(74) *Attorney, Agent, or Firm*—Bruce C. Lutz

(57) **ABSTRACT**

A method and an apparatus are provided for Radio Frequency Identification (RFID). An RFID base unit is provided that can communicate with at least two different types of RFID tags that are commercially available. Additionally, the RFID base unit can communicate with any number of devices, including but not limited to computer networks, which allow for dynamic access and updates to tailor the RFID base unit for virtually any situation. Particularly, the RFID base unit would be useful in safety and/or security applications to enable and disable automated devices.

**15 Claims, 4 Drawing Sheets**



Case 1:22-cv-00728-ADA Document 16 Page 67 Filed 01/26/2023 10



**PRIOR ART**

*FIG. 1A*



**PRIOR ART**

*FIG. 1B*



**PRIOR ART**

## FIG. 2A



**PRIOR ART**

## FIG. 2B

APPX000029



*FIG. 3*

Case 6:22-cv-00728-ADA Document 16 Page Filed 10/26/2023 Page 70 of 10



*FIG. 4*

APPX000031

US 7,233,247 B1

# METHOD AND SYSTEM FOR EMPLOYING RFID TAGS IN AUTOMATED APPLICATIONS

### FIELD OF THE INVENTION

The present invention relates generally to Radio Frequency Identification (RFID) and, more particularly, to employment of RFID tags and devices in automated applications.

### DESCRIPTION OF THE RELATED ART

RFID tags and devices have been around since World War II. The first known usage of RFID tags was by the United Kingdom's Royal Air Force. The RAF placed RFID tags in their aircraft, so that the Spitfires and other allied aircraft could be distinguished from German aircraft.

Over the years, though, RFID tags have become more ubiquitous. RFID tags are commercially available in a wide variety of applications ranging from implanted tags for keeping track of pets to toll tags. Categorically, there are three types of RFID tags commercially available: passive, semi-passive, and active. Passive tags are unpowered RFID tags that utilize radiation or electromagnetic fields in order to function. Active tags have their own power source, and semi-active tags utilize both an internal power supply and absorbed radiation or electromagnetic fields.

Referring to FIG. 1A of the drawings, the reference numeral 100 generally designates a passive RFID tag that utilizes wave reflection. Typically, the passive RFID tag 100 comprises an antenna 102, Radio Frequency (RF) Circuits 104, and an Identification (ID) circuit 106.

The passive RFID tag 100 is, by definition, unpowered. Radiation is received by the antenna 102 and transmitted to the RF circuits 104 through the communication channel 108. The RF circuits 104 can then de-modulate or processes the signals received by the antenna 102. The processed signals are then communicated to the ID circuit 106 through the communication channel 110, where the ID circuit 106 generates an ID number or some other identification signal. Once the ID circuit 106 generates an identifying signal, the RF circuit 104 and the antenna 102 can then transmit the identifying signal.

Therefore, by receiving an electromagnetic signal, processing it, and retransmitting it, the passive RFID tag 100 essentially reflects the received radiation. So, by varying the ID circuitry 106 and/or the RF circuitry 104, each tag, such as the passive RFID tag 100, can reflect radiation differently causing each tag to be distinguishable.

There are a wide variety of applications for RFID tags similar to the passive RFID tag 100. Typically, tags, like tag 100, are low cost and robust. However, the physical range and flexibility of tags, like the tag 100, are limited.

Referring to FIG. 1B of the drawings, the reference numeral 150 generally designates an active RFID tag. Typically, the active RFID tag 150 comprises an antenna 102, Radio Frequency (RF) Circuits 104, an Identification (ID) circuit 106, and a battery 112.

The active RFID tag 150 is, by definition, powered. Under the circumstance of having a powered RFID tag, there are a larger number of operations that can be performed by the active RFID tag 150. Signals can be received and transmitted by the antenna 102, which provides the signals to the RF circuits 104 through the communication channel 108. The RF circuits 104 can then modulate and de-modulate signals.

Because the active RFID tag 150 is powered by the battery 112, the ID circuits 106 can be operating constantly. The ID circuit 106 can both send signals to and receive signals from the RF circuits 104 through the communication channel 110. The ID circuit 106 can generate identifying signals or be in active communication with another RFID station. Hence, information contained on the RFID tag 150 can be updated or changed.

There are also a wide variety of applications for RFID tags similar to the active RFID tag 150. Typically, tags, like tag 150, are flexible and robust. However, the physical range and time of operation, like the tag 150(100), are limited. The batteries, such as the battery 112, will need periodic replacing or charging in order for tags, like the tag 150, to continue functioning.

There are also other types of alternately powered RF tags. Referring to FIG. 2A of the drawings, the reference numeral 200 generally designates a passive RFID tag powered by a magnetic field. The tag 200 comprises an inductor 202, power generation circuitry 204, a microcontroller 206, RF circuits 208, and an antenna 210.

The tag 200 is different, in that a magnetic coupling is needed. When the tag 200 enters into a changing magnetic field of sufficient strength, the inductor 202 couples to the field. The changing magnetic field induces a current in the inductor 202, which provides current to the power generation circuitry 204. Power can then be provided to the microcontroller 206 and the RF circuits 208 through the communication channel 212.

Once powered, the antenna 210 can send and receive information with external devices. The microcontroller 206 communicates with the RF circuits 208 through the communication channel 214 to allow for signal transmission and reception. Also, because power can be applied for long periods of time due to the magnetic coupling, it is possible to write data to the microcontroller 206 and to change information when desired.

For tags, like the tag 200, there are a wide variety of applications for RFID tags. For example, tags implanted into pets utilize a tag similar to the tag 200. These tags are typically flexible and robust. However, the physical range and time of operation are limited. A magnetic field must be provided in order for the tag 200 to function, and providing such a magnetic field can be costly in terms of power consumption.

Referring to FIG. 2B of the drawings, the reference numeral 250 generally designates a semi-passive RFID tag. The tag 250 comprises an inductor 202, power generation circuitry 204, a microcontroller 206, RF circuits 208, an antenna 210, and a battery 212.

The tag 250 is similar to the tag 200, in that a magnetic coupling is needed. However, only part of the circuitry is powered through the magnetic coupling. When the tag 250 enters into a changing magnetic field of sufficient strength, the inductor 202 couples to the field. The changing magnetic field induces a current in the inductor 202, which provides current to the power generation circuitry 204. Power can then be provided to the RF circuits 208 through the communication channel 212. The microcontroller 206, though, is constantly powered by the battery 212.

Once powered, the antenna 210 can send and receive information with external devices. The microcontroller 206 communicates with the RF circuits 208 through the communication channel 214 to allow for signal transmission and reception. Also, because power is constantly applied to the

US 7,233,247 B1

3

microcontroller **206**, it is possible to write data to the microcontroller **206** and to change information when desired.

For tags, like the tag **250**, there are a wide variety of applications for RFID tags. For example, tags implanted into pets utilize a tag similar to the tag **250**. These tags are typically flexible and robust. However, the physical range and time of operation are limited. A magnetic field must be provided in order for the tag **250** to function. Providing such a magnetic field can be costly in terms of power consumption. Additionally, the battery **212** may have to be periodically changed or recharged, which can be costly.

In each case, the RIFD tags **100**, **150**, **200**, and **250** each function in concert with an RFID base unit. Traditionally, RFID base units were tailored for specific types of tags. The RFID base units have also been tailored for specific applications, and have not been necessarily monitored. With the ever increasing utility of RFID tags, employment of a system that is easily monitored and easily established is desirable. Therefore, there is a need for a method and/or apparatus for communicating with a multitude of devices and RFID tags that at least addresses some of the problems associated with conventional RFID base units.

### SUMMARY OF THE INVENTION

The present invention provides a method and a system for securing an external device with an RFID base unit. An RFID base unit is provided that is adapted to communicate with at least a first and a second RFID tag type of a plurality of RFID tag types. An RFID tag then interfaces with the RFID base unit, where the RFID tag is of the first or the second RFID tag types. Once the at least one RFID tag interfaces with the RFID base unit, indicia of engagement, disengagement or other affect on the control or operation is communicated to the external device.

### BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present invention and the advantages thereof, reference is now made to the following descriptions taken in conjunction with the accompanying drawings, in which:

FIG. **1A** is a block diagram depicting a conventional, passive RFID tag that utilizes wave reflection;

FIG. **1B** is a block diagram depicting a conventional, active RFID tag;

FIG. **2A** is a block diagram depicting a conventional, passive RFID tag powered by a magnetic field;

FIG. **2B** is a block diagram depicting a conventional, semi-passive RFID tag;

FIG. **3** is a block diagram depicting a RFID system; and

FIG. **4** is a flow chart depicting the usage of an RFID system in a safety or security application.

### DETAILED DESCRIPTION

In the following discussion, numerous specific details are set forth to provide a thorough understanding of the present invention. However, those skilled in the art will appreciate that the present invention may be practiced without such specific details. In other instances, well-known elements have been illustrated in schematic or block diagram form in order not to obscure the present invention in unnecessary detail. Additionally, for the most part, details concerning network communications, electro-magnetic signaling techniques, and the like, have been omitted inasmuch as such

4

details are not considered necessary to obtain a complete understanding of the present invention, and are considered to be within the understanding of persons of ordinary skill in the relevant art.

It is further noted that, unless indicated otherwise, all functions described herein may be performed in either hardware or software, or some combinations thereof. In a preferred embodiment, however, the functions are performed by a processor such as a computer or an electronic data processor in accordance with code such as computer program code, software, and/or integrated circuits that are coded to perform such functions, unless indicated otherwise.

Referring to FIG. **3** of the drawings, the reference numeral **300** generally designates a RFID system. The system **300** comprises a unified RFID base unit **304**, an RFID tag **302**, a computer network **314**, automated devices **330**, alternate security device **334**, and an Input/Output (I/O) device **338**.

In operation, there a number of configurations that can be employed. In all of the systems, the RFID tag **302** communicates with the RFID base unit **304** through an RF link **332**. Depending on the type of RFID tag **302** desired, the RFID base unit **304** is equipped to communicate with any type of RFID tag.

At the center of the system **300** is the RFID base unit **304**. The RFID base unit **304** further comprises a field generator **306**, RF circuitry **308**, an antenna **309**, a microcontroller **310**, and an RF Integrated Circuit (RFIC) **312**. The RFIC **312** is coupled to the RF circuitry **308** and the microcontroller **310** through the communication channels **346** and **344**, respectively. The RF circuitry **308** communicates information to and from the RFID tag **302** by utilizing the antenna **309** and the RF link **332**. Additionally, the RF link **332** can be of multiple frequencies to communicate with standard low frequency RFID tags (between 125 kHz to 134 kHz), standard high frequency RFID tags (13.56 Mhz), standard Ultra High Frequency (UHF) RFID tags (868 Mhz to 956 MHz), and standard microwave RFID tags (2.45 GHz). The RFID base unit **304** can also be designed to be robust and powered by a variety of power sources. For example, the RFID base unit **304** can be powered by standard 110 VAC, batteries, rechargeable batteries, power over Ethernet, power over USB, etc.

Additionally, the RFID base unit **304** can be constructed using various housings for harsh environments. For example, a basic version, a shockproof version, a high/low temp environment version, a highly acidic/basic environment version, and so forth could be developed. Depending on the type of RFID tag **302**, the field generator **306** can be engaged by the RFIC **312**. Control information is provided to the field generator **306** from the RFIC **312** through the communication channel **342**, and, when desired, the field generator **306** may not be utilized. Such case where the field generator **306** may not be utilized is when the RFID tag is a passive RFID that utilize a reflected wave, such as the tag **100**. The field generator **306** is coupled to an inductor **307** for generating a magnetic field, when indicated, to provide power to a passive or semi-passive RFID tag. However, it is possible to have the field generator **306** deliver control information to a much larger generator with a large power source to generate a magnetic field.

Then, based on the configuration desired, the RFID base unit **304** can be coupled to a variety of other devices. To be able to interact with multiple devices, the microcontroller **310** can be flexible. The microcontroller **310** of the RFID base unit **304** can have memory which would include expandable volatile memory, such as Dynamic Random Access Memory (DRAM) or Static Random Access

APPX000033

US 7,233,247 B1

5

Memory (SRAM) and non-volatile memory, such as Hard Disk Drives and flash memory sticks. Additionally, standard operating systems, such as Windows CE® (Microsoft Corp, One Microsoft Way Redmond, Wash. 98052-6399) and VX Works, can be readily usable with the microcontroller 310. The microcontroller 310 can also be equipped to communicate with either a computer network 314, automated devices 330, and other devices through BlueTooth, RS232, Universal Serial Bus (USB), Ethernet, Wireless, T-carrier connections, Firewire® (Apple Computer, Inc., 1 Infinite Loop, Cupertino, Calif. 95014), Optical fiber, Zigbee® (Philips Electronics North Corp., Avenue of the Americas New York, N.Y. 100201-104), etc. Examples of interconnection of the RFID base unit 304 with a variety of other devices can be seen with the communication channels 316, 318, 320, 322, 324, and 326. The RFID base unit 304, though, does not necessarily need to be connected to a network. Rather than using the network 314 to store information related to authorization, internal memory or other devices storing, accessing or otherwise obtaining the information may be used additionally or as another option.

By equipping the RFID base unit 304 to communicate with external devices, there are a variety of configurations. The RFID base unit 304 can be connected to a remote monitoring system or can be monitored over a computer network, such as the Internet. For example, a user can be notified of operation of a through Voice over Internet Protocol (VoIP) on a cell phone. Additionally, several RFID base units 304 could be interconnected or connected with a server. Hence, by having the ability to dynamically interconnect RFID base units 304 with one another and computer networks 314, the functionality of the RFID base unit 304 and RFID tags 302 can be dynamically changed for changing conditions. For example, RIFD tags 302 can have ID numbers dynamically updated, or the software of the microcontroller 310 can be updated.

The RFID base unit 304, though, has significant potential in controlling the operation of other external devices. For example, the RFID base unit 304 could be coupled to an automated device 330 by a communication channel 328. Automation equipment 330 can also be connected directly to the I/O module. The RFID base unit 304 can then enable or disable access to the automated device 330. The RFID base unit 304 can also be coupled to an I/O device 338 through the communication channel 340, where the RFID base unit 304 can be configured to receive and/or transmit digital and/or relay signals. For example, the RFID base unit 304 can be configured to communicate with Programmable Ladder Logic Controllers (PLCs) that are common in industrial applications or with other I/O modules.

The RFID base unit 304 can also be used to discontinue the operation of other external devices. For example, a Power Source Disconnect Module (PSDM) can be used in conjunction with the RFID base unit 304. The RFID base unit 304 could be helpful as a last line of safety type of device where one might want to turn a piece of equipment completely off if an operator gets too close. For example, an industrial laser can be extremely hazardous and would need to be off if an operator is too close. Additionally, the RFID base unit 304 can be used as a fail safe in case the operator can bypass the other safety devices. Alternatively or additionally, the RFID base unit 304 could be employed to signal a controller if the proper operator is not present and/or in an acceptable location to operate a device, such as a laser or other potentially harmful or otherwise important equipment.

In high security situations, additional security devices can be employed in conjunction with the RFID base unit 304. In

6

FIG. 3, an alternative security device 334 can communicate with the RFID base unit 304 through the communication channel 336. Until conditions of both the RFID tag 302 and the alternative security device 334 are satisfied, access to an automated device or to an area is denied. For example, a fingerprint reader, an iris scanner, a retinal scanner, a facial recognition scanner, and so forth can be used as an alternative security device.

Specifically, the RFID base unit 304 is designed to have a great deal of flexibility. There are a large number of combinations of devices, RFID tags, and communication techniques that can be employed to yield that flexibility. Moreover, the RFID base unit 304 is designed to be a lower cost unit so that usage of RFID tags, particularly in commercial and industrial applications, can become more common.

An example of the usage of the RFID system 300 in an industrial application is with safety or security. Referring to FIG. 4 of the drawings, the reference numeral 400 generally designates a flow chart depicting the usage of an RFID system in a safety or security application.

In step 410, an RFID tag interfaces the RFID base unit. The RFID tag can be any type of RFID tag. During the interface, the RFID tag can be energized, and the identification information (ID) is transmitted to the RFID base unit.

Once received, the ID is analyzed. A determination is made in step 412 of whether the ID is correct or sufficient to gain access. If the ID is not correct, access to a device or area is denied in step 414. For example, if an employee attempts to operate a milling machine and if the employee's ID is not cleared to operate the milling machine, then the mill will not function.

If the ID is determined to be sufficient to gain access to a device or area, a further determination is made as to if a second tag is necessary in step 416. In some industrial and commercial applications, it is necessary to have multiple parties present during the performance of an industrial function. For example the operators of an industrial press: at least two operators need to be present at all times when the equipment is in operation in case someone gets injured such that they cannot get or seek medical attention on their own. The second tag can then be analyzed to determine if the second ID is correct. If the second ID is not correct, then access is again denied in step 414.

Once the RFID tags have proven sufficient to gain access to a device or area, a determination is made in step 420 to determine if a secondary ID is needed. If needed, then a determination is made in step 422 if the secondary ID is correct. If the secondary ID is not correct, then access is again denied in step 414. However, if the secondary ID is correct, then access is allowed in step 424. For example, a plasma etching machine may require both an RFID and a thumbprint scan to operate the machine.

It is understood that the present invention can take many forms and embodiments. Accordingly, several variations may be made in the foregoing without departing from the spirit or the scope of the invention. The capabilities outlined herein allow for the possibility of a variety of programming models. This disclosure should not be read as preferring any particular programming model, but is instead directed to the underlying mechanisms on which these programming models can be built.

Having thus described the present invention by reference to certain of its preferred embodiments, it is noted that the embodiments disclosed are illustrative rather than limiting in nature and that a wide range of variations, modifications, changes, and substitutions are contemplated in the foregoing

US 7,233,247 B1

7

disclosure and, in some instances, some features of the present invention may be employed without a corresponding use of the other features. Many such variations and modifications may be considered desirable by those skilled in the art based upon a review of the foregoing description of preferred embodiments. Accordingly, it is appropriate that the appended claims be construed broadly and in a manner consistent with the scope of the invention.

The invention claimed is:

1. A Radio Frequency Identification (RFID) base unit, comprising:

Radio Frequency (RF) circuit adapted to communicate with at least a first and a second RFID circuit type of a plurality of RFID circuit types; and

a control module including processor means at least coupled to the RF circuit, the processor means of said control module being configured to communicate with external devices through at least a first and a second connection standard of a plurality of connection standards.

2. The RFID base unit of claim 1, wherein the control module is at least configured to be in communication with a computer network.

3. The RFID base unit of claim 1, wherein the plurality of connection standards further comprises at least two of a group comprising BlueTooth, RS232, Universal Serial Bus (USB), Ethernet, Wireless, T-carrier connections, FIREWIRE, Optical fiber, ZIGBEE, and Voice over Internet Protocol (VoIP).

4. The RFID base unit of claim 1, wherein the external device is an automated device.

5. An apparatus for securing an external device with a RFID base unit, comprising:

means for providing the RFID base unit adapted to communicate with at least a first and a second RFID circuit type of a plurality of RFID circuit types;

means for interfacing at least one RFID circuit by the RFID base unit, wherein the at least one RFID circuit is a first or a second RFID circuit type; and

processor means for communicating indicia of engagement or disengagement to effect control of the external device through at least one communication standard of a plurality of communication standards, once the at least one RFID circuit interfaces the RFID base unit.

6. The apparatus of claim 5, wherein the means for communicating further comprises means for disengaging the external device when the at least one RFID circuit is engaged.

8

7. The apparatus of claim 5, further comprising means for relaying information relating to engagement or disengagement to a computer network.

8. The apparatus of claim 5, wherein said processor means is configured to determine if the at least one RFID circuit is allowed to enable or disable the external device.

9. An apparatus comprising an RFID base unit incorporating a processor wherein the base unit is at least configured to employ two or more connection standards of a plurality of connection standards and said processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit.

10. The apparatus of claim 9, wherein the plurality of communication standards further comprises BlueTooth, RS232, Universal Serial Bus (USB), Ethernet, Wireless, T-carrier connections, FIREWIRE, Optical fiber, ZIGBEE, and Voice over Internet Protocol (VoIP).

11. The apparatus of claim 9 wherein the RFID base unit is adapted to communicate with at least a first and a second RFID circuit type of a plurality of RFID circuit types.

12. A RFID base unit comprising:

RF (Radio Frequency) circuitry adapted for communicating with at least one of a plurality of RFID circuit types;

processor means operable to determine if a RFID circuit type presently being communicated with is allowed to communicate with a device external to said RFID base unit signal connection ports configured to communicate with devices external to said RFID base unit, said ports outputting signals in accordance with at least two different connection standards.

13. The apparatus of claim 12, wherein the connection standards comprise at least two of BlueTooth, RS232, Universal Serial Bus (USB), Ethernet, Wireless, T-carrier connections, FIREWIRE, Optical fiber, ZIGBEE, and Voice over Internet Protocol (VoIP).

14. The apparatus of claim 12, wherein said processor means is further operable to communicate a signal to the external device through at least one of said signal connection ports after the determination is made.

15. The apparatus of claim 12, wherein said signal connection ports configured to communicate with devices external to said RFID base unit additionally include at least one universal I/O port.

* * * * *

||||||| barcode |||||||
US007233247C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (11523rd)
# United States Patent
Crossno et al.

(10) **Number:** US 7,233,247 C1
(45) **Certificate Issued:** Jun. 7, 2019

(54) **METHOD AND SYSTEM FOR EMPLOYING RFID TAGS IN AUTOMATED APPLICATIONS**

(75) Inventors: **Adam Crossno**, Flower Mound, TX (US); **Viswanath Puttagunta**, Irving, TX (US); **Ravi Kumar Viswaraju**, Richardson, TX (US)

(73) Assignee: **INTELLECTUAL TECH LLC**, Argyle, TX (US)

Reexamination Request:
No. 90/014,010, Sep. 1, 2017

Reexamination Certificate for:
| | |
|---|---|
| Patent No.: | **7,233,247** |
| Issued: | **Jun. 19, 2007** |
| Appl. No.: | **11/039,221** |
| Filed: | **Jan. 20, 2005** |

Certificate of Correction issued Aug. 14, 2007

(51) **Int. Cl.**
| | |
|---|---|
| *G06K 7/00* | (2006.01) |
| *G06K 7/10* | (2006.01) |
| *G08B 13/14* | (2006.01) |

(52) **U.S. Cl.**
CPC ....... *G06K 7/0008* (2013.01); *G06K 7/10297* (2013.01); *G08B 13/14* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/014,010, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Robert L Nasser

(57) **ABSTRACT**

A method and an apparatus are provided for Radio Frequency Identification (RFID). An RFID base unit is provided that can communicate with at least two different types of RFID tags that are commercially available. Additionally, the RFID base unit can communicate with any number of devices, including but not limited to computer networks, which allow for dynamic access and updates to tailor the RFID base unit for virtually any situation. Particularly, the RFID base unit would be useful in safety and/or security applications to enable and disable automated devices.



US 7,233,247 C1

# 1

# EX PARTE
# REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claims **1-15** are cancelled.

New claims **16-163** are added and determined to be
patentable.

*16. An apparatus comprising:*

*a RFID base unit incorporating a processor wherein the
RFID base unit is at least configured to employ two or
more connection standards of a plurality of connection
standards and the processor is configured for output-
ting at least one signal adapted to engage or disengage
at least one device through at least one connection
standard when in communication with an RFID circuit,
and*

*at least one other RFID base unit that is capable of
communicating with the RFID base unit and is capable
of communicating with one or more external devices
using two or more wireless connection standards
including ZigBee, wireless, high-frequency RFID, and
Bluetooth,*

*wherein the RFID base unit has a Universal Serial Bus
(USB) interface, and*

*wherein the apparatus is capable of performing facial
recognition in conjunction with the RFID base unit.*

*17. The apparatus of claim 16, wherein the RFID base
unit is configured to communicate with the one or more
external devices using ZigBee and Bluetooth.*

*18. The apparatus of claim 16, wherein the RFID base
unit is configured to communicate with the one or more
external devices using ZigBee and high-frequency RFID.*

*19. The apparatus of claim 16, wherein the RFID base
unit is configured to communicate with the one or more
external devices using wireless and high-frequency RFID.*

*20. The apparatus of claim 16, wherein the RFID base
unit is configured to communicate with the one or more
external devices using Bluetooth.*

*21. The apparatus of claim 16, wherein the RFID base
unit is configured to communicate with the one or more
external devices using Bluetooth and high-frequency RFID
using an antenna.*

*22. The apparatus of claim 16 further comprising:*

*an antenna configured to transmit data using 3 or more
protocols selected from the group comprising: wireless,
Bluetooth, high-frequency RFID, and ZigBee.*

*23. The apparatus of claim 16, wherein the RFID base
unit further comprises:*

*a rechargeable battery that is capable of being charged;*

*an integrated circuit;*

*a second battery used to power the integrated circuit; and*

*dynamic random-access memory (DRAM).*

*24. The apparatus of claim 16, wherein the RFID base
unit further comprises:*

*a rechargeable battery that is capable of being charged;*

*an integrated circuit;*

# 2

*a second battery used to power the integrated circuit; and
dynamic random-access memory (DRAM) and a second
non-volatile memory,*

*wherein the integrated circuit is configured to communi-
cate using a Bluetooth wireless connection standard
through an antenna, and*

*wherein the antenna is configured for additional wireless
transmission using one or more wireless connection
standards other than Bluetooth.*

*25. The apparatus of claim 24, wherein the one or more
wireless connection standards other than Bluetooth is wire-
less communications.*

*26. The apparatus of claim 24, wherein the one or more
wireless connection standards other than Bluetooth is Zig-
Bee.*

*27. The apparatus of claim 24, wherein the one or more
wireless connection standards other than Bluetooth is high-
frequency RFID.*

*28. The apparatus of claim 16, wherein the RFID base
unit is configured to enable or disable an automated device
through Bluetooth communications, and*

*wherein the RFID base unit can be configured to be
monitored over a computer network, which is the
Internet.*

*29. The apparatus of claim 16, wherein the RFID base
unit is configured to enable or disable an automated device
through Bluetooth communications, and*

*wherein the RFID base unit is connected to a remote
monitoring system.*

*30. The apparatus of claim 16, wherein the RFID base
unit is configured to enable or disable a security device
through wireless communications.*

*31. The apparatus of claim 16, wherein the RFID base
unit is configured to enable or disable an external device
through high-frequency RFID communications.*

*32. The apparatus of claim 16 wherein the RFID base unit
is configured to communicate with a plurality of security
devices.*

*33. The apparatus of claim 16 further comprising:*

*a shockproof housing.*

*34. The apparatus of claim 16, wherein the RFID base
unit is capable of transmitting high-frequency RFID signals.*

*35. An apparatus comprising:*

*a RFID base unit incorporating a processor wherein the
RFID base unit is at least configured to employ two or
more connection standards of a plurality of connection
standards and the processor is configured for output-
ting at least one signal adapted to engage or disengage
at least one device through at least one connection
standard when in communication with an RFID circuit,
the RFID base unit further comprising:*

*an antenna and RF circuitry;*

*an operating system;*

*an internal memory; and*

*a second internal memory;*

*a rechargeable battery capable of being charged; and*

*a second RFID base unit configured to communicate with
the RFID base unit using Bluetooth communication,*

*wherein the second RFID base unit is configured to store
authorization information in the internal memory,*

*wherein the RFID base unit is configured to communicate
with an alternative security device through a first
communications channel,*

*wherein the RFID base unit is configured to transmit
signals using Bluetooth, wireless, or high-frequency
RFID through one or more communications channels
other than the first communications channel, and*

US 7,233,247 C1

**3**

wherein the RFID base unit is configured to store information related to authorization in the internal memory or the second internal memory.

36. The apparatus of claim 35,
wherein the alternative security device is a fingerprint reader,
wherein the antenna is capable of communicating with a plurality of external devices,
wherein the antenna is configured to transmit data using two or more wireless protocols selected from the group comprising wireless, Bluetooth, and ZigBee, and
wherein the RFID base unit is configured to communicate with the fingerprint reader.

37. The apparatus of claim 35, wherein the alternative security device is a facial recognition scanner.

38. The apparatus of claim 35 wherein the RFID base unit is capable of transmitting digital signals to a second security device through using one of the one or more communications channels other than the first communications channel.

39. The apparatus of claim 35 wherein the RFID base unit is configured to communicate with a plurality of security devices.

40. The apparatus of claim 35 further comprising:
a shockproof housing.

41. The apparatus of claim 35 wherein the second internal memory is DRAM memory.

42. The apparatus of claim 35 wherein the second internal memory is SRAM memory.

43. The apparatus of claim 35 wherein the second internal memory is DRAM memory that is part of a microcontroller.

44. The apparatus of claim 35 wherein the second internal memory is SRAM memory that is part of a microcontroller.

45. The apparatus of claim 35, wherein the second RFID base unit is configured to enable or disable an external device through wireless communications.

46. The apparatus of claim 35 wherein the second RFID base unit further comprises a shockproof housing.

47. The apparatus of claim 35 wherein the second RFID base unit is capable of communicating with a retinal scanner to perform a retinal scan.

48. An apparatus comprising:
a RFID base unit incorporating a processor wherein the RFID base unit is at least configured to employ two or more connection standards of a plurality of connection standards and the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit, the RFID base unit further comprising:
an antenna and RF circuitry;
an operating system;
an internal memory comprising dynamic random-access memory (DRAM); and
a rechargeable battery capable of being charged; and
a battery;
wherein the RFID base unit is configured to transmit a notification through Voice Over Internet Protocol (VOIP); and
wherein the RFID base unit is configured to communicate with an external device using Bluetooth, wireless, or high-frequency RFID.

49. The apparatus of claim 48 wherein the internal memory comprising DRAM is in a microcontroller within the RFID base unit that is capable of communicating with the external device using two or more communication protocols selected from the group comprising Bluetooth, wireless, high-frequency RFID, and ZigBee.

**4**

50. The apparatus of claim 48 wherein the RFID base unit is configured to communicate with a plurality of security devices.

51. The apparatus of claim 48 wherein the RFID base unit is capable of communicating with two or more external devices.

52. The apparatus of claim 48, wherein the RFID base unit is capable of RFID communications and using a fingerprint scan to gain access to the external device.

53. The apparatus of claim 48 wherein the RFID base unit is capable of communicating with a security device comprising a facial recognition scanner.

54. The apparatus of claim 48, wherein the RFID base unit has a Universal Serial Bus (USB) interface, and
wherein the antenna is configured to transmit data using two or more wireless protocols selected from the group comprising wireless, Bluetooth, and ZigBee.

55. The apparatus of claim 48 further comprising:
a fingerprint reader.

56. The apparatus of claim 48 further comprising:
a facial recognition scanner.

57. The apparatus of claim 48, wherein the RFID base unit is configured to enable or disable an external device through wireless communications.

58. The apparatus of claim 48 further comprising:
a shockproof housing.

59. The apparatus of claim 48, further comprising:
a second internal memory.

60. The apparatus of claim 48, wherein the RFID base unit has a Universal Serial Bus (USB) interface.

61. The apparatus of claim 48, wherein the RFID base unit is configured to communicate with the one or more external devices using high frequency RFID.

62. The apparatus of claim 48, wherein the RFID base unit has a Universal Serial Bus (USB) interface.

63. An apparatus comprising:
a RFID base unit incorporating a processor wherein the RFID base unit is at least configured to employ two or more connection standards of a plurality of connection standards and the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit, the RFID base unit further comprising:
an antenna and RF circuitry;
a microcontroller including an operating system and an internal memory comprising static random-access memory (SRAM);
a battery used for powering an integrated circuit; and
a rechargeable battery capable of being charged,
wherein the RFID base unit is configured to communicate using two or more of the following communications protocols: Bluetooth, USB, RS232, wireless, ZigBee or high-frequency RFID.

64. The apparatus of claim 63, wherein the antenna is capable of transmitting data using 3 or more protocols selected from the group comprising:
Bluetooth, USB, VoIP, RS232, high frequency RFID, and ZigBee.

65. The apparatus of claim 63 further comprising:
a fingerprint reader that sends data to the RFID base unit.

66. The apparatus of claim 63 further comprising:
a facial recognition scanner used to enable an automated device.

67. The apparatus of claim 63, wherein the RFID base unit is configured to enable or disable an automated device through wireless communications.

US 7,233,247 C1

68. The apparatus of claim 63 further comprising:
a shockproof housing.

69. The apparatus of claim 63 further comprising:
a second internal memory.

70. The apparatus of claim 63 wherein the microcontroller is capable of transmitting data using Bluetooth to one or more automated devices.

71. The apparatus of claim 63, wherein the apparatus is capable of enabling or disabling an automated device through Bluetooth communications,
  wherein the RFID base unit is configured to be monitored by one or more monitoring systems over a computer network, which is the Internet, and
  wherein notification of operation of the system is through Voice Over Internet Protocol (VOIP).

72. The apparatus of claim 63 wherein the RFID base unit is configured to enable or disable an automated device through Bluetooth communications,
  wherein the RFID base unit is configured to be monitored over a computer network, which is the Internet, and
  wherein RFID base unit is configured to interconnect with other RFID base units.

73. The apparatus of claim 63, wherein the RFID base unit is configured to enable or disable an automated device through Bluetooth communications,
  wherein the RFID base unit is configured to be monitored over a computer network, which is the Internet,
  wherein the RFID base unit is configured to interconnect with other RFID base units, and
  wherein the microcontroller further comprises a second internal memory.

74. The apparatus of claim 63, wherein the RFID base unit is configured to receive data from a fingerprint reader, wherein the antenna is configured to receive radiation, and
  wherein the RFID base unit is configured to demodulate and process signals received by the one or more antennas from two or more wireless protocols.

75. The apparatus of claim 63, wherein the RFID base unit is capable of discontinuing operation of at least one external device,
  wherein the microcontroller is associated with a second non-volatile memory within the RFID base unit,
  wherein the RFID base unit is configured to transmit a notification through Voice Over Internet Protocol (VOIP), and
  wherein the RFID base unit further comprises a USB interface.

76. The apparatus of claim 63, wherein the RFID base unit is capable of using a thumbprint scan in order to enable an external device.

77. The apparatus of claim 63, wherein the RFID base unit is capable of using a thumbprint scan and a second security measure to gain access to an automated device.

78. The apparatus of claim 63, wherein the RFID base unit is capable of signaling a controller when an operator is in an unacceptable location.

79. The apparatus of claim 63, wherein the RFID base unit is capable of signaling a controller if a proper operator is not present.

80. The apparatus of claim 63, wherein the RFID base unit is configured to receive data from an RFID tag implanted within a pet.

81. The apparatus of claim 63, wherein the RFID base unit comprises an integrated circuit, and
  wherein the RFID base unit further comprises a Universal Serial Bus (USB) interface.

82. The apparatus of claim 63, wherein the RFID base unit is capable of using the microcontroller to transmit using Bluetooth and wireless protocols, and wherein the microcontroller is capable of communicating with at least one automated device via Bluetooth.

83. The apparatus of claim 63, wherein the RFID base unit is configured to transmit a notification via Voice Over Internet Protocol (VoIP), and
  wherein the RFID base unit further comprises:
  a USB interface;
  an antenna configured to transmit high frequency RFID signals; and
  a second antenna configured to wirelessly transmit signals other than high frequency RFID signals.

84. The apparatus of claim 63, wherein the RFID base unit is capable of using a fingerprint scan to gain access to an external device.

85. The apparatus of claim 63, wherein the RFID base unit is capable of communicating with a security device comprising a facial recognition scanner.

86. The apparatus of claim 63, wherein the RFID base unit is configured to use high-frequency RFID communication as a security measure, and wherein the RFID base unit supports two or more wireless protocols selected from the group comprising wireless, Bluetooth, and ZigBee.

87. The apparatus of claim 63, wherein the RFID base unit is configured to communicate with the one or more external devices using Bluetooth.

88. A Radio Frequency Identification (RFID) apparatus comprising:
  a RFID base unit incorporating a processor wherein the RFID base unit is at least configured to employ two or more connection standards of a plurality of connection standards and the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit, the RFID base unit further comprising:
    an antenna and RF circuitry;
    a battery used for powering an integrated circuit;
    a rechargeable battery; and
    a microcontroller,
  wherein the RFID base unit is capable of communicating with one or more external devices,
  wherein the RFID base unit is capable of receiving data from a facial recognition scanner,
  wherein the RFID base unit is capable of receiving dynamic updates through a computer network,
  wherein the RFID base unit is configured to communicate using three or more of the following communications standards: Bluetooth, USB, RS232, wireless, ZigBee or high-frequency RFID, and
  wherein the RFID base unit is capable of storing data related to authorization in an internal memory.

89. The apparatus of claim 88, wherein the RFID base unit is capable of being dynamically accessed to tailor the RFID base unit related to a security application.

90. The apparatus of claim 88, wherein the RFID base unit is capable of being dynamically accessed to tailor the RFID base unit related to a safety application.

91. An apparatus comprising:
  a RFID base unit incorporating a processor wherein the RFID base unit is at least configured to employ two or more connection standards of a plurality of connection standards and the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection

US 7,233,247 C1

7

standard when in communication with an RFID circuit, the RFID base unit further comprising:

an antenna and RF circuitry;

a battery;

a microcontroller; and

an operating system,

wherein the RFID base unit is configured to disable or enable an external device using ZigBee protocol communication, and

wherein the RFID base unit is capable of being dynamically updated.

92. The apparatus of claim 91, wherein the RFID base unit is capable of storing authorization information in an internal memory on the RFID base unit.

93. The apparatus of claim 91, wherein the RFID base unit is capable of storing authorization information remotely.

94. The apparatus of claim 91, wherein the RFID base unit is configured to receive data from a fingerprint scanner.

95. The apparatus of claim 91, wherein the RFID base unit is capable of receiving facial recognition data.

96. The apparatus of claim 91 further comprising:

a fingerprint reader.

97. The apparatus of claim 91 further comprising:

a facial recognition scanner.

98. The apparatus of claim 91, wherein the RFID base unit is configured to enable or disable an automated device through wireless communications.

99. The apparatus of claim 91 further comprising:

a shockproof housing.

100. The apparatus of claim 91, wherein the RFID base unit is also capable of communicating via Bluetooth and wireless protocols.

101. An apparatus comprising:

a first RFID base unit incorporating a processor wherein the first RFID base unit is at least configured to employ two or more connection standards of a plurality of connection standards and the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit, the first RFID base unit further comprising:

an antenna;

a battery;

a microcontroller;

an operating system; and

a second RFID base unit configured to receive data from the first RFID base unit

via ZigBee communication, and

wherein the second RFID base unit is configured to communicate via Bluetooth with a third RFID base unit comprising an antenna, RF circuitry, a microcontroller, and an operating system.

102. The apparatus of claim 101 further comprising:

a fingerprint reader.

103. The apparatus of claim 101 further comprising:

a facial recognition scanner.

104. The apparatus of claim 101, wherein the first RFID base unit is configured to enable or disable an external device through wireless communications.

105. The apparatus of claim 101 further comprising:

a shockproof housing.

106. The apparatus of claim 101, wherein the first RFID base unit is capable of storing authorization information in an internal memory on the first RFID base unit.

8

107. The apparatus of claim 101, wherein the first RFID base unit is capable of storing authorization information remotely.

108. The apparatus of claim 101, wherein the first RFID base unit is capable of receiving facial recognition data.

109. The apparatus of claim 101, wherein the first RFID base unit is capable of enabling the external device via transmissions using ZigBee, and wherein the RFID base unit is capable of storing authorization information.

110. The apparatus of claim 101 wherein the first RFID base unit is configured to provide notifications of an operation of the first RFID base unit via Voice Over Internet Protocol (VOIP).

111. The apparatus of claim 101, wherein the first RFID base unit is capable of storing authorization information in an internal memory on the first RFID base unit, and wherein the first RFID base unit is configured to provide notifications of an operation of the first RFID base unit via Voice Over Internet Protocol (VOIP).

112. The apparatus of claim 101, wherein the first RFID base unit is capable of being connected to a second external device via RS232.

113. The apparatus of claim 101, wherein the first RFID base unit is capable of being connected to a second external device via a wired Ethernet connection.

114. The apparatus of claim 101, wherein the first RFID base unit is capable of being connected to a second external device through wireless communication via the Internet, and wherein the first RFID base unit is capable of storing authorization information in an internal memory on the first RFID base unit.

115. The apparatus of claim 101, wherein the first RFID base unit is capable of communicating with a second external device and a third external device via ZigBee, and wherein the first RFID base unit is capable of connecting to a fourth external device via the Internet using wireless transmission.

116. A Radio Frequency Identification (RFID) apparatus comprising:

a first RFID base unit incorporating a processor wherein the RFID base unit is at least configured to employ two or more connection standards of a plurality of connection standards and the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit, the first RFID base unit further comprising:

an antenna,

a battery;

a microcontroller; and

an operating system and

a second RFID base unit comprising:

an antenna;

a microcontroller, and

an operating system,

wherein the second RFID base unit is capable of communication with the first RFID base unit and an automated device,

wherein the second RFID base unit is configured to store information related to authorization remotely through a computer network, and

wherein the first RFID base unit is configured to enable or disable an automated device using ZigBee.

117. An apparatus comprising:

a RFID base unit incorporating a processor wherein the RFID base unit is at least configured to employ two or

US 7,233,247 C1

9

more connection standards of a plurality of connection standards and the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit, the RFID base unit further comprising:

an antenna and RF circuitry;

an operating system; and

an internal memory comprising dynamic random-access memory (DRAM),

a battery used for powering an integrated circuit configured to carry out functions of the RFID base unit; and

a rechargeable battery capable of being charged,

wherein the apparatus has a Universal Serial Bus (USB) interface,

wherein the RFID base unit is configured to transmit digital signals to an alternative security device, and

wherein the RFID base unit is configured to transmit signals using Bluetooth, wireless, or high-frequency RFID through at least one network.

118. The apparatus of claim 117 wherein the alternative security device is a fingerprint reader.

119. The apparatus of claim 117 wherein the alternative security device is a facial recognition scanner.

120. The apparatus of claim 117 further comprising:

a shockproof housing.

121. A Radio Frequency Identification (RFID) apparatus comprising:

a first RFID base unit incorporating a processor wherein the RFID base unit is at least configured to employ two or more connection standards of a plurality of connection standards and the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit, the first RFID base unit further comprising:

an antenna and RF circuitry; and

an operating system; and

a second RFID base unit comprising:

one or more antennas and RF circuitry; and

an operating system,

wherein first RFID base unit and the second RFID base unit are configured to communicate using Bluetooth, wireless, or high-frequency RFID, and

wherein one of the first or second RFID base units are configured to enable or disable at least one automated device.

122. The apparatus of claim 121 further comprising:

a fingerprint reader.

123. The apparatus of claim 121 further comprising:

a facial recognition scanner.

124. The apparatus of claim 121 further comprising:

a shockproof housing.

125. The apparatus of claim 121, wherein a server is connected to the first RFID base unit and the second RFID base unit via a computer network, which is the Internet, and wherein the first RFID base unit and the second RFID base unit internally store authorization information used to access the first RFID base unit and the second RFID base unit.

126. The apparatus of claim 121, wherein the at least one automated device is enabled or disabled via Bluetooth protocol.

127. The apparatus of claim 121 wherein each of the first RFID base unit and the second RFID base unit further comprise a rechargeable battery.

10

128. The apparatus of claim 121, wherein the first RFID base unit is capable of communicating with an external device using ZigBee.

129. A Radio Frequency Identification (RFID) apparatus comprising:

a RFID base unit incorporating a processor wherein the RFID base unit is at least configured to employ two or more connection standards of a plurality of connection standards and the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit, the RFID base unit further comprising:

an antenna and RF circuitry; and

an operating system,

wherein the RFID base unit is configured to be remotely monitored via a computer network,

wherein the RFID base unit is configured to receive updates to modify the RFID base unit,

wherein the RFID base unit has a Universal Serial Bus (USB) interface,

wherein the RFID base unit is configured to transmit a notification through Voice Over Internet Protocol (VOIP);

wherein the RFID base unit is configured to communicate via two or more communication protocols selected from the group comprising wireless, Bluetooth, and ZigBee,

wherein the RFID base unit is configured to communicate with a server, and

wherein the RFID base unit is configured to enable an automated device through Bluetooth or ZigBee communications.

130. An apparatus comprising:

a RFID base unit incorporating a processor wherein the RFID base unit is at least configured to employ two or more connection standards of a plurality of connection standards and the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit,

wherein the RFID base unit is capable of communicating with at least one other RFID base unit,

wherein the RFID base unit is capable of communicating via three or more wireless connection standards including ZigBee, wireless, high-frequency RFID, and Bluetooth,

wherein the RFID base unit has a Universal Serial Bus (USB) interface,

wherein the apparatus is capable of performing facial recognition in conjunction with the RFID base unit, and wherein the RFID base unit comprises:

a rechargeable battery;

a second battery used to power an integrated circuit; and

dynamic random-access memory (DRAM),

wherein the RFID base unit is configured to communicate with a first automated device using a Bluetooth wireless connection standard through a first antenna, and

wherein the RFID base unit is configured to communicate with a second device using a wireless connection standard other than Bluetooth through a second antenna.

131. The apparatus of claim 130, wherein the wireless connection standard other than Bluetooth is wireless.

132. The apparatus of claim 130, wherein the wireless connection standard other than Bluetooth is High Frequency RFID.

US 7,233,247 C1

11

*133. The apparatus of claim 130 wherein the RFID base unit is configured to communicate with a plurality of security devices.*

*134. The apparatus of claim 130 further comprising: a shockproof housing.*

*135. The apparatus of claim 130 further comprising: a facial recognition scanner.*

*136. The apparatus of claim 130, wherein the RFID base unit is capable of discontinuing operation of at least one external device.*

*137. The apparatus of claim 130, wherein the RFID base unit is capable of using a fingerprint scan and a second security measure to gain access to an automated device.*

*138. An apparatus comprising:*
*a RFID base unit incorporating a processor wherein the RFID base unit is at least configured to employ two or more connection standards of a plurality of connection standards and the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit, the RFID base unit further comprising:*
*an antenna and RF circuitry; and*
*an operating system; and*
*a shockproof housing,*
*wherein RFID base unit is configured to communicate with at least two security devices using wireless protocol, and*
*wherein the RFID base unit is configured to enable or disable an external device.*

*139. The apparatus of claim 138 wherein one of the at least two security devices is a fingerprint reader.*

*140. The apparatus of claim 138 wherein one of the at least two security devices is a facial recognition scanner.*

*141. The apparatus of claim 138, wherein the RFID base unit is configured to enable or disable the external device through wireless communications.*

*142. The apparatus of claim 138 further comprising: a facial recognition scanner.*

*143. The apparatus of claim 138 wherein the RFID base unit is capable of communicating with external devices using the antenna.*

*144. An apparatus comprising:*
*a RFID base unit incorporating a processor wherein the RFID base unit is at least configured to employ two or more connection standards of a plurality of connection standards and the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit, the RFID base unit further comprising:*
*an antenna and RF circuitry;*
*an operating system;*
*an internal memory; and*
*a rechargeable battery capable of being charged; and*
*a shockproof housing,*
*wherein the RFID base unit is configured to transmit digital signals to an alternative security device through a first communications channel,*
*wherein the RFID base unit is configured to transmit signals through two or more communication channels other than the first communications channel, and*
*wherein the RFID base unit is configured to store information related to authorization in the internal memory.*

12

*145. The apparatus of claim 144, wherein the RFID base unit is configured to transmit signals using the two or more communication channels other than the first communications channel.*

*146. The apparatus of claim 144, wherein the RFID base unit is configured to transmit digital signals to a second security device.*

*147. The apparatus of claim 144 wherein the RFID base unit is capable of being configured to communicate with a plurality of security devices.*

*148. The apparatus of claim 144, wherein the apparatus is capable of performing a retinal scan.*

*149. An apparatus comprising:*
*an RFID base unit incorporating a processor wherein the RFID base unit is at least configured to employ two or more connection standards of a plurality of connection standards and the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit; and*
*a microcontroller comprising:*
*SRAM memory;*
*non-volatile memory; and*
*an operating system,*
*wherein the microcontroller is capable of communicating with a first automated device via Bluetooth, and*
*wherein the microcontroller is capable of communication with a second automated device via wireless communications.*

*150. The apparatus of claim 149, wherein the apparatus is configured to enable or disable the first automated device or the second automated device.*

*151. The apparatus of claim 149 further comprising: an antenna configured to transmit high-frequency RFID signals; and a second antenna configured to wirelessly transmit signals other that high-frequency RFID signals,*
*wherein the RFID base unit further comprises:*
*an USB interface; and*
*a rechargeable battery.*

*152. The apparatus of claim 149 further comprising: a facial recognition scanner.*

*153. The apparatus of claim 149 further comprising: a retinal scanner.*

*154. An apparatus comprising:*
*an RFID base unit incorporating a processor wherein the RFID base unit is at least configured to employ two or more connection standards of a plurality of connection standards and the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit; and*
*a microcontroller comprising:*
*a volatile memory;*
*a non-volatile memory; and*
*an operating system,*
*wherein the apparatus is capable of communicating with a first automated device via Bluetooth;*
*wherein the apparatus is capable of communication with a second automated device via wireless communications.*

*155. The apparatus of claim 154, wherein the volatile memory is DRAM.*

*156. The apparatus of claim 154, wherein the volatile memory is SRAM.*

US 7,233,247 C1

**13**

*157. The apparatus of claim 154, wherein the apparatus is configured to enable or disable the first automated device or the second automated device through high-frequency RFID communications.*

*158. The apparatus of claim 154 further comprising:*
*a fingerprint reader.*

*159. The apparatus of claim 154 further comprising:*
*a facial recognition scanner.*

*160. The apparatus of claim 154 further comprising:*
*a retinal scanner.*

*161. A RFID base unit comprising:*
*one or more antennas and RF circuitry adapted to communicate with at least a first and a second RF circuit type of a plurality of RF circuit types;*
*a control module including a processor at least coupled to the RF circuitry, the processor of the control module being configured to communicate with external devices*

**14**

*through at least a first and a second connection standard of a plurality of connection standards;*
*an operating system;*
*an internal memory;*
*a rechargeable battery capable of being charged;*
*an Ethernet interface;*
*an RS-232 interface; and*
*a retinal scanner,*
*wherein the RFID base unit is capable of communication with a remote device via high-frequency radio communications.*

*162. The RFID base unit of claim 161, wherein the remote device is a security device.*

*163. The RFID base unit of claim 161, wherein the RFID base unit is configured to enable or disable an automated device.*

\* \* \* \* \*

APPX000043