# United States Court of Appeals for the Federal Circuit

---

**INTELLECTUAL TECH LLC,**
*Plaintiff-Appellant*

**v.**

**ZEBRA TECHNOLOGIES CORPORATION,**
*Defendant-Appellee*

---

2022-2207

---

Appeal from the United States District Court for the Western District of Texas in No. 6:19-cv-00628-ADA, Judge Alan D. Albright.

---

Decided: May 1, 2024

---

JAMES PERKINS, Cole Schotz P.C., Dallas, TX, argued for plaintiff-appellant. Also represented by TIMOTHY J.H. CRADDOCK, GARY SORDEN.

WILLIAM R. PETERSON, Morgan, Lewis & Bockius LLP, Houston, TX, argued for defendant-appellee. Also represented by KARON NICOLE FOWLER, JAMES JOHN KRITSAS, AMANDA SCOTT WILLIAMSON, Chicago, IL; BRENT A. HAWKINS, San Francisco, CA.

---

Before PROST, TARANTO, and HUGHES, *Circuit Judges*.

PROST, *Circuit Judge*.

Intellectual Tech LLC ("IT") appeals from a decision of the United States District Court for the Western District of Texas dismissing all its claims against Zebra Technologies Corporation ("Zebra") for lack of constitutional standing. *Intell. Tech LLC v. Zebra Techs. Corp.*, No. 6:19-cv-628, 2022 WL 1608014 (W.D. Tex. May 20, 2022) ("*Opinion*"). For the reasons below, we reverse and remand.

## BACKGROUND

In 2019, IT asserted U.S. Patent No. 7,233,247 ("the '247 patent") against Zebra. J.A. 67. The complaint alleged, among other things, that IT "is the owner and assignee" of the '247 patent. Compl., *Intell. Tech LLC v. Zebra Techs. Corp.*, No. 6:19-cv-628 (W.D. Tex. Oct. 22, 2019), ECF No. 1 ¶ 7. Zebra first moved to dismiss the complaint for lack of standing, and the district court denied the motion. J.A. 300. Subsequently, Zebra moved for summary judgment of no subject-matter jurisdiction based on IT's purported lack of constitutional and statutory standing. J.A. 309. The district court considered this a renewed motion to dismiss, granted the motion based on its determination that IT lacked constitutional standing, and dismissed all claims without prejudice. *Opinion*, 2022 WL 1608014.

IT is the wholly owned subsidiary of OnAsset Intelligence, Inc. ("OnAsset"). Rule 7.1 Corporate Disclosure Statement, *Intell. Tech LLC v. Zebra Techs. Corp.*, No. 6:19-cv-628, (W.D. Tex. Oct. 22, 2019), ECF No. 2. Here, the history of OnAsset's agreements with a lender, Main Street Capital Corporation ("Main Street"), provides important background regarding IT's creation and its legal interest in the '247 patent. We first outline these agreements and then describe the underlying district court decision.

I

In 2011, OnAsset granted Main Street a security interest in its patents—including the ’247 patent, which was assigned to OnAsset at the time—as part of a loan agreement. J.A. 229–39 (2011 Patent and Trademark Security Agreement); J.A. 477–89 (Security Agreement); J.A. 399–466 (Loan Agreement). The terms gave Main Street certain rights that it could exercise upon OnAsset’s default of the loan. In 2013, Main Street notified OnAsset that it was in default. J.A. 510–12.

Subsequently, in 2017, OnAsset and Main Street entered into a forbearance agreement. J.A. 162. At the same time, IT was formed as OnAsset’s subsidiary, and OnAsset assigned the ’247 patent to IT. J.A. 283–85; J.A. 184. In turn, IT entered into a joinder agreement to the loan agreement between OnAsset and Main Street. J.A. 211. And IT entered into its own patent and trademark security agreement with Main Street, granting Main Street a security interest in the ’247 patent like OnAsset had. J.A. 249 (2017 Patent and Trademark Security Agreement). However, by 2018, IT had defaulted as well. *Opinion*, 2022 WL 1608014, at *3, *4 n.2.

IT agrees with the district court’s assessment that the 2011 and 2017 patent and trademark security agreements have “mirrored” terms. *See* Appellant’s Br. 11 n.1 (citing *Opinion*, 2022 WL 1608014, at *3). As a result, Main Street’s default rights at the time the complaint was filed in 2019 were the same whether assessed based on OnAsset’s 2013 default (where IT’s assignment from OnAsset was subject to these rights) or IT’s own 2018 default. We follow the parties’ and district court’s convention of citing the 2011 agreement throughout.

Turning to the pertinent provisions, section 4 of the patent and trademark security agreement provides:

> 4. Debtor's Use of the Patents and Trademarks. Debtor shall be permitted to control and manage the Patents and Trademarks, including the right to exclude others from making, using or selling items covered by the Patents and Trademarks and any licenses thereunder, in the same manner and with the same effect as if this Agreement had not been entered into, so long as no Default exists.

J.A. 232.

In the event of a default, section 6 provides options that Main Street can elect to exercise:

> 6. Remedies. While a Default exists, Secured Party may, at its option, take any or all of the following actions:
>
> > (a) Secured Party may exercise any or all remedies available under the Loan Agreement.
> >
> > (b) Secured Party may sell, assign, transfer, pledge, encumber or otherwise dispose of the Patents and Trademarks.
> >
> > (c) Secured Party may enforce the Patents and Trademarks and any licenses thereunder, and if Secured Party shall commence any suit for such enforcement, Debtor shall, at the request of Secured Party, do any and all lawful acts and execute any and all proper documents required by Secured Party in aid of such enforcement.

J.A. 232.

In turn, section 3(j) provides mechanisms for Main Street to exercise its rights. Specifically, it states:

> 3. Representations, Warranties and Agreements. Debtor represents, warrants and agrees as follows:

. . .

> (j) **Power of Attorney.** To facilitate Secured Party's taking action under subsection (i) and exercising its rights under ***Section 6***, Debtor hereby irrevocably appoints (which appointment is coupled with an interest) Secured Party, or its delegate, as the attorney-in-fact of Debtor with the right (but not the duty) from time to time while a Default exists to create, prepare, complete, execute, deliver, endorse or file, in the name and on behalf of Debtor, any and all instruments, documents, applications, financing statements, and other agreements and writings required to be obtained, executed, delivered or endorsed by Debtor under this ***Section 3***, or, necessary for Secured Party, while a Default exists, to enforce or use the Patents or Trademarks or to grant or issue any exclusive or non-exclusive license under the Patents or Trademarks to any third party, or to sell, assign, transfer, pledge, encumber or otherwise transfer title in or dispose of the Patents or Trademarks to any third party. Debtor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof. The power of attorney granted herein shall terminate upon the termination of the Loan Agreement as provided therein and the payment and performance of all Obligations.

J.A. 230–32 (emphasis in original). Zebra has not pointed to evidence that Main Street has elected to exercise any

rights under section 6 or taken any action as attorney in fact under section 3(j).[1]

## II

Zebra moved to dismiss for lack of standing under Federal Rules of Civil Procedure 12(b)(1) and 12(c). The district court denied the motion, concluding that IT "is the rightful owner of the '247 patent, retains the right to enforce that patent, and thus has constitutional and statutory standing to bring a patent infringement suit against Zebra." J.A. 300.

Zebra renewed its standing arguments in the form of a motion for summary judgment for lack of subject-matter jurisdiction. Zebra primarily argued that OnAsset's initial default in 2013 triggered an immediate transfer of exclusionary rights to Main Street such that OnAsset had no exclusionary rights to assign IT as of the 2017 assignment agreements. J.A. 316.

The district court rejected this primary argument, concluding that default gave Main Street the right "to enforce, 'sell, assign, transfer, pledge, encumber or otherwise dispose of' the '247 patent," but it did not "automatically divest OnAsset of title to the '247 patent." *Opinion*, 2022 WL 1608014, at *3 (quoting J.A. 232 (2011 Patent and Trademark Security Agreement, section 6)). Nonetheless, the district court granted Zebra's motion as to constitutional standing—which the court restyled as a renewed motion

---

[1] After the complaint was filed, IT, OnAsset, and Main Street entered into an amended forbearance agreement that extended the forbearance date to the end of 2022. J.A. 557. However, because this does not alter the constitutional standing analysis as of the complaint's filing date, we need not assess the impact of forbearance on Main Street's rights. *See Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309–10 (Fed. Cir. 2003).

under Rule 12(b)(1)—because, in its view, the fact that "Zebra could obtain a license on the ['247] patent from Main Street" deprived IT of all its exclusionary rights. *Id.* at *7. The district court acknowledged that one way to read section 6 of the agreement was that it did not give Main Street a right to license, but the district court seemed to conclude that Main Street's ability to assign, and Zebra's theoretical ability to obtain title from such an assignment, had the same impact on the standing analysis as Main Street having "an unconditional right to license." *Id.* at *7 n.4. The court stated that it was "follow[ing] [two district court] *Uniloc* opinions, and their extension of [the Federal Circuit decision in] *WiAV*, to find a lack of constitutional standing." *Id.* at *7 (citing *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1266 (Fed. Cir. 2010); *Uniloc USA, Inc. v. Apple, Inc.*, No. C 18-00358, 2020 WL 7122617 (N.D. Cal. Dec. 4, 2020); *Uniloc USA, Inc. v. Motorola Mobility, LLC*, No. CV 17-1658, 2020 WL 7771219 (D. Del. Dec. 30, 2020)).

Next, the court rejected "IT['s] request[] that it be afforded the opportunity to cure any defects in constitutional standing by joining Main Street or substituting it under Federal Rules of Civil Procedure 19 or 20." *Id.* at *8. The court reasoned that the standing defect existed at the time of filing and was therefore incurable. *Id.* Finally, the court found it unnecessary to reach Zebra's arguments related to statutory standing in light of the Article III (i.e., constitutional) determination. *Id.* The court dismissed all of IT's claims without prejudice. *Id.*

IT moved for reconsideration. J.A. 581–82. The court denied IT's motion, largely reiterating the reasoning it outlined in its initial decision. *Intell. Tech LLC v. Zebra Techs. Corp.*, No. 6:19-cv-628, 2022 WL 3088572 (W.D. Tex. Aug. 3, 2022). The court summarized its understanding of the relevant law as follows: "a patent title holder can deprive itself of exclusionary rights by vesting a third party with a right to assign or sublicense the patent (even if the third party never exercises those rights)." *Id.* at *2. The court

acknowledged that "IT may be correct that it is more accurate to say that, on default, Main Street has an unfettered right to license and/or assign the '247 patent in *IT's name*." *Id.* at *3 (emphasis in original). However, the court considered its analysis "completely unaffected by this" purported agency-based distinction. *Id.*

IT timely appealed. J.A. 611. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## DISCUSSION

### I

Article III standing determinations are reviewed de novo. *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1363 (Fed. Cir. 2010). Standing requires: (1) an injury in fact; (2) traceability; and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The only meaningful dispute raised by the circumstances here relates to the injury-in-fact requirement.[2] An injury in fact is an "actual or imminent" "concrete and particularized" "invasion of a legally protected interest." *Id.* at 560. This requirement is mandatory at the inception of the lawsuit and carries through the case, requiring the plaintiff to prove it "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561.

The interpretation of an unambiguous contract is a legal issue, and we review the district court's interpretation de novo. *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004). It is undisputed that Texas law applies to the

---

[2] Zebra does present a cursory redressability argument based on IT's ability to sufficiently prove its damages model. Appellee's Br. 25. Because this is an argument about IT's ability to prove substantive elements of its claims instead of a jurisdictional argument, we reject it without further discussion.

agreements at issue here. *See* Appellant's Br. 8; Appellee's Br. 8. Under Texas law, contracts are read as a whole to give meaning to the parties' intent as expressed in the writing, and an agreement is considered ambiguous only where the language of the contract is subject to two or more reasonable interpretations or meanings. *Gonzalez*, 394 F.3d at 392; *see also Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (concluding that an agreement is not ambiguous where, "after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning").

## II

The only question before us is whether IT demonstrated the irreducible constitutional minimum of an injury in fact. All that requires here is that IT retained *an* exclusionary right—i.e., infringement would amount to an invasion of IT's legally protected interest. Under the only reasonable reading of the patent and trademark security agreement, IT still retained at least one exclusionary right, even in view of the rights Main Street gained upon default.

Before going further, it is perhaps just as important to frame what is *not* at issue on appeal here. We need not determine whether IT's legal interest in the '247 patent was sufficient to meet the "patentee" requirement of 35 U.S.C. § 281, an issue the district court did not reach. This court has clarified, in light of the Supreme Court's opinion in *Lexmark International, Inc. v. Static Control Components, Inc.,* 572 U.S. 118 (2014), that § 281 is not a jurisdictional requirement. *See Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1235 (Fed. Cir. 2019) ("*Lexmark* is irreconcilable with our earlier authority treating § 281 as a jurisdictional requirement."); *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1071 (Fed. Cir. 2020) ("[*Lone Star*] recognized that intervening Supreme Court precedent made clear that our earlier decisions treating the prerequisites of the

Patent Act as jurisdictional were wrong."). Further, we have acknowledged that the § 281 inquiry (sometimes called statutory standing in our cases, particularly before *Lexmark*) and the injury-in-fact inquiry (for constitutional standing) are distinct. *Lone Star*, 925 F.3d at 1234–35 ("[A]lthough Lone Star does not possess all substantial rights in the asserted patents [to satisfy § 281] its allegations still satisfy Article III."); *Univ. of S. Fla. Rsch. Found., Inc. v. Fujifilm Med. Sys. U.S.A., Inc.*, 19 F.4th 1315, 1324 (Fed. Cir. 2021) ("[W]e hold [the plaintiff] fails to meet the statutory requirements of § 281 but does meet the requirements of constitutional standing."). In general, the question for the injury-in-fact threshold is whether a party has *an* exclusionary right. *Univ. of S. Fla. Rsch. Found.*, 19 F.4th at 1323.

Prior to our case law's acknowledgement of this jurisdictional and substantive distinction, many of this court's opinions had improperly melded the injury-in-fact inquiry with the § 281 inquiry—often performing a combined analysis of the two simultaneously. The lack of delineation between these two separate legal questions in prior opinions may have caused some of the uncertainty the district court grappled with here. However, the implications illustrate why the distinction is critical. Article III standing is a jurisdictional requirement, which is incurable if absent at the initiation of suit. *See Paradise Creations,* 315 F.3d at 1309–10; *Abraxis*, 625 F.3d at 1366 n.2. Further, for Article III purposes, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). The issue of whether the statutory requirements of § 281 are met, on the other hand, is not jurisdictional and

a defect is curable by joinder. *Lone Star*, 925 F.3d at 1235–36.[3]

We now turn to the only question on appeal, whether IT had *an* exclusionary right in the '247 patent when the complaint was filed. The answer is a clear yes.

Zebra argues that Main Street's ability to license the '247 patent pursuant to section 3(j) of the agreement deprived IT of all exclusionary rights. Zebra makes two arguments related to licensing: (1) Main Street had the exclusive ability to license upon default, which deprived IT of all exclusionary rights, Appellee's Br. 29–32; and (2) even if both Main Street and IT had the ability to license upon default, Main Street's non-exclusive ability to do so still divested IT of all exclusionary rights, *id.* at 17–29.

First, based on our assessment of the patent and trademark security agreement as a whole, we reject Zebra's argument that the agreement granted Main Street exclusive licensing rights upon default. Nothing in the agreement indicates that, without further action by Main Street, the mere triggering of Main Street's *options* under section 6

---

[3] Issues of joinder are also not before us on appeal. Because the district court concluded that IT lacked constitutional standing, it did not assess IT's proposed joinder of Main Street under Federal Rules of Civil Procedure 19 or 20. *Opinion*, 2022 WL 1608014, at *8. In light of our determination that IT does have constitutional standing, issues of joinder can, if necessary, be addressed on remand. *See Lone Star*, 925 F.3d at 1236–39. We also note that following the dismissal here, Main Street, OnAsset, and IT filed suit as co-plaintiffs. *Intell. Tech LLC v. Zebra Techs. Corp.*, No. 6:22-cv-00788 (W.D. Tex.). That case is currently stayed pending this appeal. Order Staying Case, *Intell. Tech LLC v. Zebra Techs. Corp.*, No. 6:22-cv-788 (W.D. Tex. Jan. 9, 2023), ECF No. 48.

and mechanisms under section 3(j) automatically deprived IT of all its rights under section 4. Because we reject this exclusive-rights argument based on our interpretation of the agreement alone, we need not assess whether IT would have constitutional standing under that reading of the agreement.

Next, we conclude that IT retained exclusionary rights even though Main Street had the non-exclusive ability to license the ’247 patent.[4] A patent owner has exclusionary rights sufficient to meet the injury-in-fact requirement even where, without more, it grants another party the ability to license. *See Uniloc USA, Inc. v. Motorola Mobility LLC*, 52 F.4th 1340, 1345 (Fed. Cir. 2022) (observing but not holding that “[p]atent owners and licensees do not have identical patent rights, and patent owners arguably do not lack standing simply because they granted a license that gave another party the right to sublicense the patent to an alleged infringer”); *see also id.* at 1351 (Lourie, J., additional views) (“The grant of a non-exclusive license with the right to sublicense, as here, gives the licensee the right to sublicense others. But the patentee still retains the right to sue unlicensed infringers.”).[5]

---

[4] We need not address the parties’ dispute about the agency-based implications of the attorney-in-fact provision in section 3(j) because our conclusion is the same even if, upon default, Main Street could grant licenses on behalf of itself. At oral argument in this court, Zebra stated that it was not relying on the attorney-in-fact provision as a ground independent of the section 6 and 3(j) provisions. Oral Arg. at 11:55–12:02, No. 22-2207, https://oralarguments.cafc.uscourts.gov/default.aspx?fl=22-2207_04032024.mp3.

[5] In *Uniloc*, the district court concluded that a lender’s ability to sublicense upon default deprived the patent owner of standing, and this court affirmed the no-

Zebra relies heavily on this court's opinion in *WiAV*, as the district court did in its opinion, to support its argument that Main Street's non-exclusive ability to license stripped IT of all exclusionary rights. However, *WiAV* is not instructive here.

In *WiAV*, the court asked whether the plaintiff was an exclusive licensee (an entity that received an exclusionary right as part of a license) or bare licensee (an entity that received only "a promise from the patentee that the patentee will not sue the licensee for practicing the patented invention"). 631 F.3d at 1265. And, even through that lens, which is distinct from the situation at issue here, the court still rejected the notion that "the licensee must be the *only* party with the ability to license the patent" in order to constitute an exclusive licensee. *Id.* at 1266 (emphasis in original). There, in order to assess whether the plaintiff's license included the rights to exclude the alleged infringer, the court assessed whether the alleged infringer possessed or was capable of "obtaining[] a license of those rights from any other party." *Id.* at 1266–67. Ultimately, the court determined that WiAV's sole ability to practice and sublicense within its licensed subfield was sufficient to demonstrate that its license had conferred an exclusionary right and, as a result, infringement within that subfield amounted to an injury in fact. *Id.* at 1267.

The licensee-versus-patentee distinction between *WiAV* and this case is critical. A patent owner has exclusionary rights as a baseline matter unless it has

---

standing judgment based only on collateral estoppel as a result of an earlier unappealed loss on the issue by Uniloc. 52 F.4th at 1345. The reasoning of the district court's standing determination in *Uniloc* has not been endorsed by this court.

transferred all exclusionary rights away.[6] In contrast, a licensee ordinarily obtains freedom from suit but does not necessarily obtain an interest in preventing others from practicing the patent. As a result, in the licensee context, questions about other entities' ability to license can provide a reasonable proxy for understanding the extent of rights a licensee received as part of the license—i.e., whether the license granted exclusionary rights or mere freedom from suit. Those same questions do not provide a reasonable proxy for understanding whether a patent owner retains at least one exclusionary right or whether it has transferred all exclusionary rights away. As Judge Lourie explained in his additional views in *Uniloc*, the issue of patent owner's exclusionary rights is "incorrectly dealt with . . . as one of determining what is an exclusive license." 52 F.4th at 1351 (Lourie, J., additional views).

We need not enumerate the exclusionary rights afforded by a patent or fully define their scope here. Instead, it is sufficient to conclude that Main Street and IT's shared ability to license while a default existed did not divest IT, the patent owner, of *all* exclusionary rights. Cases that have evaluated a patent owner's rights support this conclusion. For example, in *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, this court concluded that the patent owner had not transferred away all of its rights where the rights it granted to a third party, including an unfettered right to sublicense (among many other rights), were given "for only a limited portion of the patent term." 434 F.3d 1336, 1342–43 (Fed. Cir. 2006); *see also Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.*, 604 F.3d 1354, 1361 (Fed. Cir. 2010) (concluding that the patent owner had not transferred away all rights, even under an exclusive license with

---

[6] Because there is no dispute that OnAsset had all rights in the '247 patent before its loan agreement with Main Street, the patent owner framing is apt here.

rights to sublicense, where the patent owner retained the right to sue). Further, in the context of patent co-owners, which share exclusionary rights, we have concluded that an individual co-owner has Article III standing. *See AntennaSys, Inc. v. AQYR Techs., Inc.*, 976 F.3d 1374, 1378 (Fed. Cir. 2020). In sum, IT still suffers an injury in fact from infringement even if IT and Main Street can both license the patent.

In addition to its arguments about licensing, Zebra also argues that the clause in section 6 of the patent and trademark security agreement that granted Main Street the *option* to "sell, assign, transfer, pledge, encumber or otherwise dispose of the" '247 patent, J.A. 232, divested IT of all exclusionary rights. We disagree on this point as well.

Main Street's unexercised option to assign—whether to itself or to others—was not a present divestment of IT's exclusionary rights. Zebra's arguments treat Main Street's option to assign as equivalent to the ultimate ability to license under *WiAV*. Whatever role another entity's ability to license has in the Article III inquiry for a patent owner, it is clear that assignment must be evaluated based on the actual transfer of rights, not mere ability. *See Abraxis*, 625 F.3d at 1364–65 (evaluating whether rights transferred automatically or were set to transfer at some point in the future); *Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1352–53 (Fed. Cir. 2007) (holding that the plaintiff had Article III standing even where the government had "*discretionary* authority to take title" to the asserted patent because the government "ha[d] shown no interest" in doing so (emphasis in original)). The district court correctly determined that IT was not automatically divested of title upon default. However, it incorrectly concluded that Main Street's *option* to assign presently divested IT of all other legal interests in the '247 patent. The exclusionary rights that IT would have lost upon Main Street's foreclosure or assignment to another

party must be evaluated in the same way the court evaluated title—based on the actual state of rights instead of their hypothetical redistribution at some unspecified point in the future. Because Main Street did not exercise any options under section 6, IT was not presently divested of all exclusionary rights.

## CONCLUSION

Main Street's default rights under the patent and trademark security agreement did not deprive IT of all exclusionary rights. Thus, the district court incorrectly determined that IT could not demonstrate that infringement of the '247 patent amounted to an injury in fact. Because IT has constitutional standing, we reverse and remand.

**REVERSED AND REMANDED**

## COSTS

Costs to IT.